In the Matter of MANDALAY SHORES COOPERATIVE HOUSING ASSOCIATION, Debtor.

Bankruptcy No. 81–547 BK T.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Feb. 2, 1984.

Jawdett Rubaii, William O'Malley, Clearwater, Fla., for debtor.

Helen Ellis, Dept. of Business Regulation, Tallahassee, Fla., Ward & Wagstaff, Largo, Fla., William Borja, Clearwater, Fla., for Ex-Members.

## ORDER ON OBJECTION TO CLAIMS

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case commenced by Mandalay Shores Cooperative Housing Association (Debtor), a non-profit corporation and the matters under consideration are numerous objections to claims filed by the Debtor who challenges the claims filed by certain members of the Association. The Debtor seeks a disallowance of these claims on the grounds that these parties do not hold a "claim" within the meaning of that term as defined by § 101(4) of the Bankruptcy Code; particularly, it is the contention of the Debtor that the parties whose claims are challenged, while they were at one time members of the Association, are no longer members in good standing because they have failed to keep up their membership dues and pay certain assessments authorized by the By-Laws of the Association. In order to put the issues in an understandable light in this very complex case, a recital of the relevant facts as appear from the record would be helpful.

Mandalay Shores Apartments is a large multi-unit apartment complex located in Clearwater, Florida. At the time pertinent to the matter under consideration, the

apartment complex was owned by the Department of Housing and Urban Development (HUD), an agency of the United States Government. Sometime in 1979, it appeared likely that HUD might attempt to sell the complex to a private entrepreneur who most likely would turn the complex into a condominium project. This possibility was fraught with far-reaching consequences for the tenants of the complex, the vast majority of whom were elderly and retired persons who did not have the funds to purchase the units they occupied. This threat of losing their apartments was even more significant in light of the fact that they had enjoyed a very advantageous lease arrangement in the complex and paid rent far below the market rate for an excellent facility located on the Gulf of Mexico.

Sometime in early August, 1979 the idea of acquiring the project from HUD became the subject of extensive discussions among the tenants. The proponent of the idea, Mr. Jack Burr, advanced the proposition to create an entity, either a non-profit corporation or a cooperative association which would be in a position to negotiate with HUD for the purchase of the complex. On August 7, 1979, the tenants in fact formed a non-profit corporation and obtained a corporate charter. Between August 1 and August 16, the tenants held numerous meetings at which time it was explained to the persons in attendance that it was necessary to collect $100,000 immediately in order to make an earnest money deposit toward the purchase of the complex. It was proposed that the tenants could buy either a full membership in the Association or place the funds in escrow, which funds were to be refunded in the event that the Association was unable to purchase the complex. A full membership was available only to the tenants who lived in the building; escrow membership was available to all who desired to become members whether they lived in the complex or not. The funds needed for the downpayment was collected without any difficulty and the parties who contributed funds were given a receipt which in pertinent part reads as follows:

"As you were informed at our general meetings, by unamious vote your membership certificate when issued after the title to Mandalay Shores Apartment is acquired cannot be sold by you, but you will have the right to surrender the same together with possession of your apartment to the Cooperative Association and will receive full redemption payments including any interest which may have accrued thereon. You are also informed by unanimous vote that in order to prevent any forfeiture of our $100,000 earnest money paid to HUD with our offer on August 10, 1979, there cannot be any redemption of any shares until after HUD accepts our offer and title passes to your co-op. In the event HUD rejects our offer, you will be called to a general meeting of all members to vote and decide our next step to protect our interest and lifestyle here at Mandalay Shores Apartments."

The Debtor did make a formal offer to HUD to purchase the project and forwarded to HUD a certified check in the amount of $100,000. HUD rejected the offer and returned the check to the Debtor who thereafter delivered the same by hand directly to the office of HUD in Washington, D.C. HUD refused to accept the check and it was again returned to the Debtor who then converted the certified check into an irrevocable letter of credit made out in favor of HUD. Although the negotiations were still in progress, it became clear by February, 1980 that HUD was not to be agreeable to selling the project to the Debtor. This decision by HUD was finally formalized by a letter sent by the Regional Administrator of HUD on February 12, 1980 in which he informed the Debtor that its offer to purchase the complex was rejected with finality.

It further appears from the record that the original By-Laws defined a member in good standing as one who has paid to the Association all assessments and obligations due to date (Debtor's Exh. # 2, Article V, Clause 3, Subclause a). The leadership decided to amend the By-Laws, which were

amended on February 12, 1980, after the Debtor was notified by HUD that the Debtor would not be able to buy the project. The amendment redefined the definition of "members in good standing" by providing that a member in good standing is one who has paid to the Association all assessments and all obligations due to date or *"who has not requested and/or received a refund of any deposits or assessments or has not renounced or resigned his or her or their membership or is not maintaining any form of action in law or equity or otherwise for refund of any such monies against the Association civil action in the state court in order to obtain a refund."* (emphasis supplied). It further appears that certain members requested a refund in light of the apparent lack of progress toward the purchase and some actively filed a suit in the state court seeking a refund.

After the receipt of the letter of final rejection, the Board of Directors called an emergency meeting of the Board to which all members were invited. The notice of the emergency meeting scheduled for February 14, 1980 informed the members that both counsel for the Association would be present to advise the members and answer any questions the members might have concerning the next step. At the meeting, counsel for the Board informed the membership of the action taken by HUD and in response to a query by one of the members, counsel for the Association announced that it was his opinion that in light of the fact that the object of the Association failed, and the Association would not be able to obtain the property, parties who desired to obtain the refund of their contribution could do so. This, of course, created an avalanche of demands and several tenants on February 16, 1980 requested, in writing, a refund of their contributions (Claimant's Exh. # 1). This letter included a statement that the request for refund is made pursuant to the advice of an attorney who informed the membership that the rejection was not on the regional level, but by the decision making group in Washington office of HUD, and that in light of the rejection of the offer to purchase, in effect,

the Association is dissolved and each member must make an individual decision whether to continue further efforts to obtain the building or to withdraw from membership and receive his proportionate share of the assets in the cooperative.

In light of these developments, the Board of Directors called a meeting of the Board and a special meeting of all members, for February 29, 1980 at which time only members of "good standing" as defined by the amendment of February 12, were permitted to attend. At this meeting it was decided by the members in "good standing" that is, the group loyal to Mr. Burr, that the Association shall proceed with litigation to force HUD to sell the complex to the membership. The Debtor did, in fact, file several lawsuits attempting to obtain the property, however, to date the suits have produced no success. One of the lawsuits reached the United States Supreme Court, again without success inasmuch as the petition for writ of certiorari was denied. It should be noted that one of the actions is still pending before the Eleventh Circuit Court of Appeals.

It is without question that although some members who requested the refund received a refund, members who filed a claim in this case, whose claims are now under challenge, made a demand for a refund, but did not receive a refund.

There is hardly any doubt that the sole and unique object of this Association was to acquire ownership of this particular complex in order to assure that the members of the Association will have an economically favorable accommodation for the rest of their lives. It is equally clear that they contributed their funds solely for that purpose and for no other purpose, contrary to the contention of the Board of Directors which now contends that while the principal purpose and object of the Association was to obtain ownership of Mandalay Shores, it was also formed to promote the general welfare of the members in general which goal may be accomplished by the acquisition of alternate housing.

It is true that while the corporate charter uses the general broad language usually employed in forming non-profit corporations, it is clear that from the point of formation of the Association until the commencement of this Chapter 11 case, the members of the corporation understood that they could obtain a refund in the event that the Association was unable to obtain ownership of Mandalay Shores. As noted earlier, this was recognized by the Board which did, in fact, grant some requests for refunds in the past. It was not until the special meeting of the Board and the meeting of the members in "good standing" held on February 29, that the Board took the position that the Association still had a viable object which it was entitled to pursue, and that since the funds were needed to accomplish this goal, no refunds could or would be made to anyone.

It is the contention of the Board of Directors of the Association that the claimants whose claims are under challenge do not hold a "claim"; therefore, the objections must be sustained and their claims should be disallowed. In support of this proposition, counsel for the Association urges that members who have taken a hostile and antagonistic position to the aims of the Association forfeited all their rights, and because they are no longer members in "good standing" within the meaning of that term as defined by the amendment added to the By-Laws in early February, they are not entitled to a refund and do not have a claim.

The standing of a party of interest to assert a claim in a bankruptcy proceeding must, of course, be determined with reference to the Bankruptcy Code itself. Thus, the initial inquiry must begin with the consideration of whether or not these members are, in fact, "creditors" within the meaning of that term as used in the Bankruptcy Code. Section 101(9) defines the term and provides as follows:

§ 101   Definition

(9) "Creditor" means—

(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;

(B) entity that has a claim against the estate of a kind specified in section 502(f), 502(g), 502(h) or 502(i) of this title; or

(C) entity that has a community claim.

The term "claim" is also defined by the Code in § 101(4) and it states that:

§ 101   Definitions

(4) claim means—

(A) right to a payment, whether or not such right is reduced to judgment, unliquidated, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to a payment whether or not such right to an equitable remedy is reduced to a judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

Thus, it is evident that the definition of the term "claim" as set forth in this subclause adopted a much broader definition of the term "claim" than was found in the previous rehabilitation chapters. The definition was designed to encompass and give the broadest possible definition. By use of the term throughout Title 11, the Bankruptcy Code contemplated that *all* legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in a bankruptcy case and, therefore, it was designed to permit the broadest possible relief in the bankruptcy court. *See, H.R.Rep. 95–595, 95th Cong., 1st Sess. 309 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 21 (1978)*, U.S.Code Cong. & Admin.News 1978, p. 5787.

While both terms, "creditors" and "claims," are governed by the definition furnished by the Bankruptcy Code, the underlying right to a payment is determined by substantive local law. Thus, if under the applicable local law these parties whose claims are under challenge are not entitled to any relief against the debtor, then evi-

dently they do not have a claim which could be allowed in spite of an extremely broad definition of the Bankruptcy Code. This is precisely the point on which counsel for the Association relies contending that under the applicable law, this being a non-profit corporation, these parties are not entitled to assert any claim against the Association based on the decision of the Supreme Court of the State, *Clearwater Citrus Growers' Assoc. v. Andrews*, 81 Fla. 299, 87 So. 903 (1921).

In the *Clearwater Citrus Grower's* case, three fourths of the membership of a not for profit corporation sought to dissolve the corporation by selling and disposing of its assets and then voluntarily withdrawing from the corporation. Remaining members refused to recognize the attempted dissolution and continued to operate under the leadership of new officers. The Court recognized that the intention of the withdrawing members was to dissolve the corporation, but because they failed to follow the method set forth in the controlling statute (Chapter 5958, Laws of Florida, 1909) their attempt to dissolve the corporation was unsuccessful and their subsequent voluntary withdrawal "... had the effect only of severing their membership and all connection with or interest in the association, its property or its assets."

The members who withdrew from the corporation filed a bill and asked the Court to appoint a receiver to wind up the affairs of the corporation. The Court noted, however, that the Bill was not filed until seven years after the members had withdrawn from the association. The Court stated:

> The situation is this: The Clearwater Citrus Grower's Association is a going corporation, not for profit, from which some of the members who voluntarily withdrew about seven years ago are asking that the affairs of the corporation be wound up and its assets divided and that they receive a portion of them. Just where the independent equity exists from this situation we fail to see.

*supra* 87 So. at 904. Based on these facts, the Court concluded that by withdrawing from the association, they surrendered all rights as members and any interest in association assets.

It is the opinion of this Court that the facts in the case at bar are readily distinguishable from those in *Citrus Growers* and, therefore, the case is inapposite. In *Citrus*, the association was formed to engage in a commercial enterprise and the contributions by the members were given unconditionally. The dissenters waited seven years to file a suit in order to dissolve an operating, albeit, restructured organization. In the present case, as noted earlier, the claimants are elderly, retired persons who resided in Mandalay Shores Apartments in 1979 when it became apparent that HUD might sell the building. In an attempt to preserve their homes, the tenants joined to form an association and contributed funds for the sole purpose of acquiring title of the complex. This Association, unlike the co-op involved in *Citrus Growers, supra,* was not formed for any commercial purpose, but was designed only as a vehicle used by members to combine their resources in order to obtain ownership of the complex to secure their apartments and maintain their established life styles.

The record reveals that over a very short period of time (approximately two weeks), the members were informed of the gravity of the situation, confronted with a proposal to purchase the building and asked to contribute a sum of money equal to one years rent in order to present to HUD an offer to purchase accompanied by an earnest money deposit. There is no doubt that the members were assured early on that their money would be absolutely safe and that they could get their money back if HUD rejected the offer. Further, the members were told that Mr. Burr had obtained certain relevant information from Congressman Kelley's office, but that he (Burr) was not at liberty to disclose all pertinent information to the members. It also appears that the residents were advised at an early meeting that due to time constraints, there was insufficient time for an individual to

consult with an attorney. Certainly, the members were encouraged to rely on the judgment and representations of their officers and counsel for the Association.

As noted earlier, HUD rejected the offer submitted by the Association on February 12, 1980 and on February 14, 1980 counsel for the Board informed the membership that inasmuch as the object of the Association had failed, members who desired a refund were entitled to receive the same. Of course, in view of the amendments to the By-Laws, effected on February 12, 1980, the requests for refunds in accordance with counsel's representations on February 14 operated to transform the requesting parties into members *not* in "good standing." Clearly, this was not the factual situation presented to the Florida Supreme Court in *Clearwater Citrus Grower's Assoc. v. Andrews*, 81 Fla. 299, 87 So. 903 (1921), and this Court is constrained to conclude that *Clearwater Citrus Grower's* is not controlling.

In light of the foregoing, the Court is of the opinion that the objection to claims filed by Mandalay Shores is without merit and shall be overruled.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Objection to Claims filed by Mandalay Shores Cooperative Housing Association be, and the same hereby is, overruled and the claims shall be allowed.