**ALTA VISTA STATE BANK, Appellant,**

v.

**Linda KOBLISKA, First National Bank of Minneapolis, d/b/a First Bank, Minneapolis, Appellee.**

No. 89–1496.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 11, 1989.

Decided March 1, 1990.

John Wendell Holmes, Waterloo, Iowa, for appellant.

David A. Ranheim, Minneapolis, Minn., for appellee.

Before McMILLIAN and WOLLMAN, Circuit Judges, and SNEED,* Senior Circuit Judge.

McMILLIAN, Circuit Judge.

Alta Vista State Bank (Alta Vista) appeals from a final order entered in the District Court[1] for the Northern District of Iowa granting summary judgment in favor of First National Bank of Minneapolis (First Bank Minneapolis). For reversal, Alta Vista argues that the district court erred in finding that First Bank Minneapolis had no duty to disclose to Alta Vista its suspicions that a mutual customer was kiting checks between the two banks. We affirm.

## I.

Alta Vista and First Bank Minneapolis were each the victim of a check kiting scheme perpetrated by Andersen's Agri–Center (Andersen's).[2] Andersen's opened a checking account with Alta Vista in 1979 and another with First Bank Minneapolis in March 1985. In the fall of 1985, Andersen's began depositing checks written on its First Bank Minneapolis account in its Alta Vista account. Like most banks, Alta Vista allowed Andersen's to draw on the deposited amount before it collected the funds from First Bank Minneapolis. Andersen's would then deposit a check in its First Bank Minneapolis account drawn on insufficient funds in its Alta Vista account, and First Bank Minneapolis would likewise allow it to immediately draw on the deposited but not yet collected funds.

Two checks drawn on the Andersen's account at First Bank Minneapolis are at the center of this controversy. Andersen's deposited the checks, dated August 1, 1986, and numbered 0548 and 0549, in its Alta Vista account. The two checks totalled $1,415,032.90. Alta Vista (the depositary bank) sent the checks through the chain of collection which involved several intermediary banks including First Bank St. Paul.[3] First Bank St. Paul contracts with FBS Services, Inc. (FBSSI) to process its checks. As the last bank in the chain of collection, First Bank St. Paul via FBSSI presented the checks for payment to First Bank Minneapolis (the drawee or payor bank).

Andersen's also kited checks between First Bank Minneapolis and First Bank Billings, an affiliate of First Bank Minneapolis. First Bank Billings triggered the collapse of the entire scheme when, on August 5, 1986, it contacted First Bank Minneapolis about the possible kite between the two accounts. First Bank Minneapolis then no-

---

* The Honorable Joseph T. Sneed, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

1. The Honorable David R. Hansen, United States District Judge for the Northern District of Iowa.

2. The Supreme Court succinctly explained check kiting in Williams v. United States, 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 3089–90 n. 1, 73 L.Ed.2d 767 (1981) (citations omitted):

   The check kiter opens an account at Bank A with a nominal deposit. He [or she] then writes a check on that account for a large sum, such as $50,000. The check kiter then opens an account at Bank B and deposits the $50,000 check from Bank A in that account. At the time of deposit, the check is not supported by sufficient funds in the account at Bank A. However, Bank B, unaware of this fact, gives the check kiter immediate credit on his [or her] account at Bank B. During the several-day period that the check on Bank A is being processed for collection from that bank, the check kiter writes a $50,000 check on his [or her] account at Bank B and deposits it

   into his [or her] account at Bank A. At the time of the deposit of that check, Bank A gives the check kiter immediate credit on his [or her] account there, and on the basis of that grant of credit pays the original $50,000 check when it is presented for collection.

   By repeating this scheme, or some variation of it, the check kiter can use the $50,000 credit originally given by Bank B as an interest-fee loan for an extended period of time. In effect, the check kiter can take advantage of the several-day period required for the transmittal, processing, and payment of checks from accounts in different banks.

3. The clearing process of a check drawn on one bank and deposited in another follows one of two methods. The depositary bank can either send the check for collection through correspondent banks, as Alta Vista did here, or it can collect the check through a clearinghouse such as the United States Federal Reserve. See Jordan, Ending the Floating Check Game: The Policy Arguments for Delayed Availability Reform, 36 Hastings L.Rev. 515, 522–25 (1985) (discussing only the clearinghouse method).

ticed that the Andersen's account contained a large balance of uncollected funds, and decided to return any check drawn on the Andersen's account and presented to it for payment on that day. First Bank Minneapolis discovered the two checks presented by Alta Vista, numbers 0548 and 0549.

Alta Vista concedes that First Bank Minneapolis followed the proper procedure for returning checks drawn on uncollected funds. First Bank Minneapolis first requested its check processor, FBSSI, to begin the return process. FBSSI sent the checks through several intermediary banks. The last bank in the chain, National Bank of Waterloo, notified Alta Vista on August 5, 1986, that First Bank Minneapolis was returning two checks due to uncollected funds in the Andersen's account.

In addition to following the statutory procedure for returning checks, First Bank Minneapolis asked FBS Agricultural Credit Corporation (FBS-Ag), located near Alta Vista, Iowa, to notify Alta Vista that First Bank Minneapolis would be returning two checks totalling $1.4 million. FBS-Ag finally reached Alta Vista vice-president Roger Busch at home at 5:41 p.m. on August 5, 1986. FBS-Ag told Busch that First Bank Minneapolis was returning two checks due to uncollected funds in the Andersen's account, and invited Busch to participate in a meeting with Andersen's that evening. Busch and Alta Vista's president attended the meeting, but did not return to the bank that evening to see if there were any checks posted that day that could be returned. The next day, Alta Vista discovered a depository transfer check (DTC)[4] in the amount of $1,405,921.16 drawn by Andersen's on its Alta Vista account and presented for payment by First Bank Minneapolis. Because Iowa law requires that

checks be returned by midnight on the day they are posted, Alta Vista was unable to return the check and suffered a loss of $1.4 million. See Iowa Code § 554.4301 (1985).

Alta Vista initially filed this suit against First Bank Minneapolis in state court alleging that, as a result of First Bank Minneapolis's failure to inform Alta Vista on August 5, 1986, of its suspicions that Andersen's was kiting checks, Alta Vista suffered a $1.4 million loss. First Bank Minneapolis removed the suit to federal district court. See 28 U.S.C. § 1441 (1982). Alta Vista advanced three theories of liability: (1) First Bank Minneapolis acted as Alta Vista's agent in the check clearing process, thereby creating a duty to disclose; (2) First Bank Minneapolis and Alta Vista had a "special relationship," thus creating a duty to disclose; and (3) First Bank Minneapolis's decision to specially notify Alta Vista via FBS-Ag of the returned checks created an additional duty to disclose its suspicions of the kite. The district court granted First Bank Minneapolis's motion for summary judgment, holding that First Bank Minneapolis did not have a duty to disclose its suspicions that Andersen's was kiting checks, and further held that under Iowa law Alta Vista is strictly liable on the DTC. This appeal followed.

## II.

### Iowa Code § 554.4201

Alta Vista argues that First Bank Minneapolis was its agent as to checks 0548 and 0549, and owed it all the duties associated with the agency relationship including the duty to disclose its suspicions that Andersen's was kiting checks. See Restatement (Second) of Agency § 381 (1958). Alta Vista bases its agency theory on Iowa Code § 554.4201 (1985), hereinafter referred to as U.C.C. § 4-201.[5] The

---

**4.** A DTC is created by the depositary bank in response to a telephone communication with the account holder. The customer informs the bank that it wishes to make a deposit. The bank then creates the document representing the amount deposited and sends it out for collection.

**5.** This issue presents a choice of law problem not decided by the district court. Iowa Code

§ 554.4102(2) (1985) states that "liability of a bank for action or nonaction with respect to any item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank is located." Because Alta Vista seeks to impose liability on First Bank Minneapolis, located in Minnesota, it appears that Minnesota law governs. The district court did not address the choice of law

district court found that U.C.C. § 4–201 expressly rejects Alta Vista's theory, and we agree.

U.C.C. § 4–201 provides in pertinent part:

(1) Unless a contrary intent clearly appears and prior to the time that a settlement given by a collecting bank for an item is or becomes final (subsection (3) of Section 554.4211 and Sections 554.4212 and 554.4213) the bank is an agent or subagent of the owner of the item and any settlement given for the item is provisional.

A "collecting bank" is any bank, *other than the payor bank,* that handles an item for collection. U.C.C. § 4–105(d) (emphasis added). U.C.C. § 4–201 establishes a presumption that the collecting bank, including the depositary bank, acts only as an agent in the collection process, not as the owner of the item. U.C.C. § 4–201 comment 2. Ownership of the item remains with the customer of the depositary bank, who under U.C.C. § 4–201 becomes the principal to the collecting banks. *See also* U.C.C. § 4–208 comment 1. Applying U.C.C. § 4–201 to the facts of this case, it is clear that Alta Vista and all intermediary banks which handled checks 0548 and 0549 before they were presented to First Bank Minneapolis were agents of Andersen's. As the district court noted, U.C.C. § 4–201 expressly excludes First Bank Minneapolis, as the payor bank, from the agency relationship.

Alta Vista attempts to avoid the express language of U.C.C. § 4–201 by substituting itself as owner of the checks and First Bank Minneapolis as agent. First, Alta Vista argues that because Andersen's was kiting checks, Alta Vista stepped into its shoes as the owner of the checks and principal to the collecting banks.[6] Alta Vista

next argues that because FBSSI, as the agent of a collecting bank, acted as its agent for collection, "FBSSI had the duty to notify us about the kite." Reply Brief for Appellant at 5. Alta Vista argues that because FBSSI also acted as an agent for First Bank Minneapolis, First Bank Minneapolis had the duty to tell FBSSI that it suspected a kite.

Alta Vista's arguments are not supported by the language of or comments to U.C.C. § 4–201. We decline to find that such an agency relationship exists. The banking provisions of the U.C.C. were designed to allow simple and expeditious transfers of items for collection. *See United States ex rel. Westinghouse Elec. Corp. v. Sommer Corp.,* 580 F.2d 179, 183 (5th Cir.1978). As First Bank Minneapolis points out, Alta Vista's theory would impose an enormous burden on all banking institutions which act as a collecting bank numerous times a day. Alta Vista responds that this burden would only be imposed when the last bank in the collection chain contracts with a third party to do its check processing and the third party also has a contract with the payor bank. Reply Brief for Appellant at 6. Even if this situation is as rare as Alta Vista argues it is, we see no reason to impose on the payor bank agency duties clearly not intended by the law governing check collection. *See* U.C.C. § 4–201.

*Special Relationship*

Alta Vista next argues that the unique structure of the chain of collection for the two Andersen's checks created a special relationship between Alta Vista and First Bank Minneapolis that imposed a duty on First Bank Minneapolis to disclose its suspicions about the check kiting scheme. Alta Vista concedes that ordinarily a payor bank does not owe a duty of

question because both Iowa and Minnesota have adopted all relevant provisions of the U.C.C. and the result would therefore be the same under either law. We agree with the district court that the result is the same under either Minnesota or Iowa law.

6. U.C.C. § 4–208 outlines the depositary bank's interest in items deposited and sent out for collection. That section provides that the bank

has a security interest in the item. Alta Vista argues it was entitled to prefer its interest in the two checks over the interest of Andersen's and thereby became an owner of the items for purposes of U.C.C. § 4–201. We need not decide the merits of Alta Vista's argument because we hold that even if Alta Vista was the owner of the checks for purposes of U.C.C. § 4–201, First Bank Minneapolis was not Alta Vista's agent.

care to another bank in the collection chain. Brief for Appellant at 28. Again, Alta Vista points to the involvement of FBSSI as the agent of Alta Vista in the collection process and as the subsequent agent of First Bank Minneapolis in the check return process.

Alta Vista's arguments are without merit. FBSSI's involvement in the collection process, both as the agent of the collecting bank for Alta Vista and as the agent for First Bank Minneapolis, does not create a special relationship between Alta Vista and First Bank Minneapolis. This fact alone does not distinguish this case from *Mid–Cal National Bank v. Federal Reserve Bank of San Francisco*, 590 F.2d 761 (9th Cir.1979) (*Mid–Cal*). *See also Citizens Nat'l Bank v. First Nat'l Bank*, 347 So.2d 964 (Miss.1977). *Mid–Cal* involved two victims of a check-kiting scheme. In *Mid–Cal*, the Bank of Stockton sought to recover from Mid–Cal for its negligence in not disclosing information which would have revealed the existence of the kiting scheme. 590 F.2d at 762. The court searched for facts that might establish a special relationship imposing a duty on Mid–Cal to disclose its evidence of the scheme. The court stated:

> The relationship between these banks contains none of the qualities that lead courts and commentators to find parties legally blame-worthy for failing to help another. No fiduciary or confidential nature to their relationship was alleged; they related at arm's length. Stockton was in no need of protection from Mid–Cal; it had computers and other means available to it to detect the kite, and was thus as able to protect itself from loss. To determine that in such a situation Mid–Cal owed a duty to discover the kite would be to alter radically the nature of banking and the general conduct of business. Such an alteration is neither necessary nor warranted.

*Id.* at 763. The same is true here. As the district court noted, there is no evidence that Alta Vista and First Bank Minneapolis dealt with each other short of arm's length. Alta Vista and First Bank Minneapolis are competitors in the banking field. We decline to find that one bank has a duty to notify a competing bank as soon as it suspects a mutual customer is kiting checks, especially where, as here, the other bank is in just as good a position to discover the kite.

*Duty to Fully Disclose*

■ Finally, Alta Vista argues that by volunteering to do more than the U.C.C. requires—namely asking FBS–Ag to notify Alta Vista of its decision to return two checks—First Bank Minneapolis assumed the additional responsibility of informing Alta Vista of the check kite. The three cases Alta Vista cites to support its position involve allegations of misrepresentation amounting to fraud in the inducement of a contract. *See First Nat'l Bank v. Brown*, 181 N.W.2d 178 (Iowa 1970); *Loghry v. Capel*, 257 Iowa 285, 132 N.W.2d 417 (1965); *Consolidated Foods Corp. v. Pearson*, 287 Minn. 305, 178 N.W.2d 223 (1970); In *First National Bank v. Brown*, for example, the court recognized that "[o]rdinarily mere silence on the part of one party, in an arm's length transaction, as to material facts discoverable by the other does not serve to create actionable fraud." 181 N.W.2d at 182 (citing 12 S. Williston, A Treatise on the Law of Contracts § 1497 (3d ed. 1970)). The court went on to distinguish a situation where there exists between the parties a relationship of trust or confidence, an element we find missing in the case at hand. We find nothing in First Bank Minneapolis's decision to notify Alta Vista by telephone of the return that would impose upon it a further obligation to reveal its suspicions that a mutual customer was kiting checks. Alta Vista was in just as good a position as First Bank Minneapolis to discover the scheme, and its officers could have returned to the bank on the evening of August 5, 1986, to see if it could return any checks drawn on the Andersen's account.

Accordingly, the order of the district court granting summary judgment in favor of First Bank Minneapolis is affirmed.