UNITED STATES of America, Appellee,

v.

Robert J. TAYLOR, Appellant.

No. 85–1364.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 12, 1986.

Decided April 28, 1986.

Douglas L. Phillips, Sioux City, Iowa, for appellant.

Richard L. Murphy, Asst. U.S. Atty., Sioux City, Iowa, for appellee.

Before LAY, Chief Judge, ROSS and WOLLMAN, Circuit Judges.

LAY, Chief Judge.

Robert Taylor was charged and convicted of six counts of mail fraud in violation of 18 U.S.C. § 1341[1] and one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371. On appeal, he contends that the evidence was insufficient to convict him on any count. We agree; we vacate the judgment of conviction.

The facts developed at trial are undisputed. Taylor was a life insurance agent in Spencer, Iowa. In the fall of 1982, Taylor, along with several partners, participated in the development of a gold mining venture in Arizona. One of the partners in the scheme was Ron Olson of RRO Enterprises in Portland, Oregon. In September, 1982, a $60,000 mineral rights payment came due, and Taylor's help was sought in meeting the payment. Taylor was assured that Olson would soon receive a loan from an outside lender, and that Taylor would be reimbursed from the loan if Taylor would put up the money immediately. Based on these assurances, Taylor wrote Olson a check for $60,000 on Taylor's Spenco Credit Union account (Spenco) in Spencer. Taylor admitted that he knew there were insufficient funds in the account to cover the check. The Spenco check was dated October 29, 1982 and made payable to RRO Enterprises. Olson deposited the check in an account with the Canadian Imperial Bank in Portland, Oregon.

On November 10, the check was received by Spenco for payment, having been cleared through Norwest Bank in Des Moines and electronically transmitted to Spenco. A Spenco bank officer then discovered that there were insufficient funds in Taylor's account to cover the check. Taylor was called for an explanation, and he assured the bank that he would be right in with a deposit. He arrived at the bank soon thereafter with another check for $60,000 drawn on the Dakota County Bank from an account Taylor had with that bank. The Dakota County Bank check was also drawn on insufficient funds. Taylor admits he knew of the insufficiency, but still hoped the $60,000 payment promised him would arrive to cover the check.

Spenco, not knowing there existed insufficient funds to cover the check, deposited Taylor's Dakota County Bank check into Spenco's own account at the United Central Bank. Taylor then convinced his fiancee (later wife) Connie Wasmund to write him a $60,000 check on her account at the United Central Bank. He deposited this check in the Dakota County Bank to temporarily cover the check he had just written to Spenco.

In the meantime, the Dakota County Bank had informed Spenco that Taylor's Dakota County check was going to be returned. Spenco also received notice in the mail from United Central Bank that Spenco's account with them was being charged

---

1. The mail fraud statute, 18 U.S.C. § 1341, provides in relevant part that:

    [w]hoever, having devised or intending to devise any scheme or artifice to defraud, * * * for the purpose of executing such scheme or artifice * * * places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, * * * or knowingly causes to be delivered by mail according to the direction thereon, * * * shall be fined not more than $1,000 or imprisoned not more than five years, or both.

$60,000 because of insufficient funds in Taylor's Dakota County account. Spenco mailed its own notice of insufficient funds to Taylor; similar notices were mailed to Taylor and Wasmund regarding Wasmund's $60,000 check. At this point Taylor again admitted to Spenco that he had been floating checks, but continued to assure the credit union that the $60,000 was forthcoming.

Taylor thereafter wrote another worthless $60,000 check to Wasmund on his account at the Stewardship Bank of Oregon. Wasmund deposited it immediately in her United Central Bank account. The Stewardship check was later returned to Wasmund by United Central. In January, 1983, Spenco mailed a "Notice Prior to Prosecution for Theft (Bad Check)" to Taylor, and put the $60,000 paid over to Olson on a loan basis with a mortgage on Taylor's home as security. Taylor was unable to repay the loan and the mortgage proved worthless. Finally, in August of 1983, Spenco mailed an insurance claim for $60,000 to its bonding company to recover the loss.

Taylor was subsequently indicted for six counts of mail fraud and one count of conspiracy to commit mail fraud. A jury convicted Taylor on all counts. The district court[2] sentenced Taylor to one year in prison, with five years probation, and ordered restitution of the $60,000. The issues presented on appeal are (1) whether the scheme to defraud Spenco of $60,000 came to rest at the time that Taylor's check to Olson was honored by payment of $60,000 to Olson; and (2) whether there exists sufficient evidence of the "mailing" requirements under section 1341 which distinguish this offense from other frauds punishable by state law. *See Kann v. United States*, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). For the following reasons, we conclude that the evidence was insufficient and reverse Taylor's conviction on all counts.

In order to prove a violation of section 1341, the government must prove beyond a reasonable doubt that the defendant devised an intentionally fraudulent scheme, that the defendant sent or caused to be sent some article through the mails, and that the use of the mails was for the purpose of executing the scheme. *United States v. Freitag*, 768 F.2d 240, 242–43 (8th Cir.1985); *see United States v. Lane,* —— U.S. ——, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986); *United States v. Maze*, 414 U.S. 395, 399–400, 94 S.Ct. 645, 648–49, 38 L.Ed.2d 603 (1974). Crucial to a conviction for mail fraud is a showing the mailings are "incident to an essential part of the scheme," although it is "not necessary that the scheme contemplate the use of the mails as an essential element." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *see also Maze*, 414 U.S. at 399, 94 S.Ct. at 648; *United States v. Cooper*, 596 F.2d 327, 329 (8th Cir.1979). Thus, as a general proposition, use of the mails after a scheme reaches fruition will not constitute grounds for a conviction. *See Maze*, 414 U.S. at 402, 94 S.Ct. at 649–50, *Kann*, 323 U.S. at 94, 65 S.Ct. at 150–51. However, it is also settled that

> [m]ailings occurring after receipt of the goods obtained by fraud are within the statute if they "were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place."

*Lane*, 106 U.S. at 733, *quoting Maze*, 414 U.S. at 403, 94 S.Ct. at 650; *see also United States v. Sampson*, 371 U.S. 75, 78, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). The central inquiry in this case is whether a sufficient relationship between an "essential part of the scheme" and the mailings existed.

It is apparent that the essence of the scheme was accomplished when Taylor in-

---

**2.** The Honorable Donald E. O'Brien, United States District Judge for the Northern District of Iowa.

duced Spenco to honor the initial worthless $60,000 check to Olson. This view of the facts is supported by the similar conclusions reached by the Supreme Court in *Kann* and *Maze*. In *Kann*, corporate officers and directors were charged with having set up a dummy corporation through which to divert profits of their own corporation for their own use. Part of this scheme included fraudulently obtaining checks payable to themselves, which were cashed or deposited at a bank and then mailed for collection to the drawee bank. The Court held that the fraud was complete when the defendants cashed the checks:

> The scheme in each case had reached fruition. The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires.

*Kann*, 323 U.S. at 94, 65 S.Ct. at 151 (footnote omitted).

Similarly, in *Maze*, the defendant used a credit card he had stolen from his roommate to buy food and lodging at several motels. The Court held that this conduct amounted to several independent serial frauds, each fraud completed each time the defendant checked out of a motel where he had used the card. The Court reached this conclusion despite the fact the defendant arguably profited from the delay caused by the process of collecting on the motels' invoices to continue his "vacation." The Court rejected the government's argument that this delay was sufficiently related to the mailing of the invoices to support the defendant's conviction:

> There was undoubtedly delay in transmitting invoices to the Louisville bank, as there is in the physical transmission of any business correspondence between cities separated by large distances. Mail service as a means of transmitting such correspondence from one city to another is designed to overcome the effect of the distance which separates the places. But it is the distance, and not the mail service, which causes the time lag in the physical transmission of such correspondence.

*Maze*, 414 U.S. at 403, 94 S.Ct. at 680 (footnotes omitted).

Just as the defendant in *Maze* completed a fraud each time he checked out of his motel rooms, and the defendants in *Kann* completed their frauds each time they successfully deposited a fraudulent check, Taylor had achieved his objective at the point he obtained the $60,000 for Olson's use. This case of course differs from *Kann* in that Taylor proceeded to write several additional bad checks to cover his initial default. However, Taylor was not engaged in a traditional check kiting operation, ordinarily deemed to persist so long as the "float" continues. *See, e.g., Freitag*, 768 F.2d at 243–44; *United States v. Scott*, 554 F.2d 866, 867 (8th Cir.1977); *United States v. Gross*, 416 F.2d 1205, 1212 (8th Cir.1969). In the ordinary check kite, the fraudulent scheme consists of a continuous fraud on multiple banks whereby a check float creates the appearance of large credit balances, permitting the defrauder to profit from the persistent mirage of having available credit. In this case, by contrast, only the first check Taylor wrote afforded him anything more than time pure and simple. Each of the subsequent checks were returned for insufficient funds; he ultimately had to sign a promissory note for the $60,000 secured by a home mortgage. Thus, the fraud reached fruition when Spenco honored the $60,000 check, and therefore the charged mailings, all of which occurred after Spenco honored the check, cannot be said to have been incidental to an essential aspect of the fraud.

Nor is this a case in which mailings subsequent to the execution of the fraud may be deemed to have lulled the victim bank into a false sense of security or delayed prosecution. The facts of *Sampson*, 371 U.S. at 76–79, 83 S.Ct. at 173–75, and *Lane*, 106 S.Ct. at 733–34, are instructive. In

those cases, the Supreme Court held that delayed mailings constituted the final gestures of an overall scheme to defraud which did lull the victims into a false sense of security. In *Sampson,* the defrauders mailed acceptances of victims' applications for services fraudulently offered. The acceptance letters were considered part of the overall scheme since the letters had the effect of lulling the victims into a belief that the services would be performed, despite the fact that the defrauders obtained all the money they expected to get from a victim before the letters were mailed. *Sampson,* 371 U.S. at 79–81, 83 S.Ct. at 175–76. Likewise, in *Lane,* the Court found that an arson scheme was not complete until all payments were received from the defrauded insurance companies, and that the insurance companies had been "lulled" by the defendants' timely submission of proof of loss forms. Had the defendants failed to submit the proof of loss forms, the court reasoned, the insurer might very well have detected the fraud. *Lane,* 106 U.S. at 733–34 & n. 16.

No similar nexus between the charged mailings and the complete execution of the fraud existed in this case.[3] The government in this case relied on six separate mailings to prove fraudulent use of the mails: (1) a notice of insufficient funds (NSF notice) mailed by United Central Bank to Connie Wasmund; (2) an NSF notice mailed to Taylor by the Dakota County Bank; (3) a charge memo mailed to Connie Wasmund by the United Central Bank; (4) a charge notice mailed to Spenco by United Central Bank; (5) the "Notice Prior to Prosecution for Theft" mailed to Taylor by Spenco; and, finally, (6) the claim letter sent by Spenco to its bonding company. Unlike the letters mailed to the victims in *Sampson,* the NSF notices, charge memos, and other mailings here did nothing to assure the banks that Taylor would follow through on his promises, that is, to deposit sufficient funds to cover the checks. Any of these mailings could more reasonably be construed as an initial step towards prosecution; thus, as in *Maze,* these mailings instead "increased the probability that [the defrauder] would be detected and apprehended." *Maze,* 414 U.S. at 403, 94 S.Ct. at 650. Similarly, in contrast to the proof of loss forms submitted by the defendant arsonists in *Lane,* these mailings did nothing to fortify the banks' confidence in the regularity of their dealings with Taylor. Again, if anything, these mailings only evidenced the banks' declining confidence in Taylor.

We would reach the same conclusion even if we held that the essence of the scheme encompassed the entire four check escapade, because the charged mailings, even under that view of the facts, did not "further" the scheme.[4] In *United States*

3. There is no dispute that the jury had sufficient evidence to reasonably find that Taylor caused the mailings charged in the indictment and proved at trial. *See United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974), *quoting Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954).

4. It is important to note that here, unlike the ordinary check kiting case, the government neither charged or attempted to prove that Taylor used the mails to send the initial check to Ron Olson in Oregon, that he used the mails to deposit the subsequent checks, or that the banks used the mails in the process of clearing the checks. Where such use of the mails had been proved, courts have had little difficulty holding that the "furtherance" requirement is supported by the evidence. *See Pereira,* 347 U.S. at 8, 74 S.Ct. at 362 ("substantial evidence" to show that check mailed for collection); *United States v. Cooper,* 596 F.2d 327, 330 (8th Cir.1979) (de-

fendant testified he was aware of bank procedures); *United States v. Foshee,* 569 F.2d 401, 406 (5th Cir.1978) (government proved that the banks used the mails to clear checks); *United States v. Scott,* 554 F.2d 866, 867–68 (8th Cir. 1977) (bank employee gave testimony that mails used for collection process); *United States v. Street,* 529 F.2d 226, 227 (6th Cir.1976) (no dispute that the mails used in the collection process). We have stated, though, that when the "government [does] not present any evidence as to how the bank offices cleared checks with one another * * * we assume that the checks were not cleared via the mail." *United States v. Freitag,* 768 F.2d 240, 242 (8th Cir.1985). The only evidence as to how the checks cleared in this case was testimony by a bank employee that the original check transaction was communicated electronically at least from Des Moines to Spenco, evidence only reinforcing the assumption that the mails were not used for this purpose.

*v. Britzman,* 547 F.2d 380 (7th Cir.1977), the court held that NSF notices were insufficiently related to the execution of a check kiting scheme to bring the defendant's conduct within the mail fraud statute. The government in that case argued that the overdraft notices furthered the scheme in three respects: they permitted the defendants to calibrate the time lag in the check clearing process, alerted the defendants of the need to float another check, and informed the defendants that the banks were as yet unsuspecting that a check kite was in operation. The court rejected those arguments, observing that the defendants did not in fact use the NSF notices to adjust for any delay, or to signal them that another check needed to be deposited, and that the banks would have sent NSF notices even if they did suspect that a check kite was afoot. *Id.* at 382–84.

In this case, the government does not even make an argument that the NSF and charge notices were used in executing the scheme, nor could such an argument be successfully made. Taylor's strategy was simply to write or cause to be written as many "covering" checks as he could in a short period on every available bank account. This was not, then, a fine-tuned operation where the receipt of NSF notices or bank statements informed the check kite operator of the length of time involved for the checks to clear, *see United States v. Pick,* 724 F.2d 297, 300–301 (2d Cir.1983) (bank statements enabled defendants to know how quickly checks were clearing), or to keep track of accounting balances in each account. *See Freitag,* 768 F.2d at 243 (bank statement used for such purpose); *see also United States v. Knight,* 607 F.2d 1172, 1175–76 (5th Cir.1979) (bank statement mailed to false address). Under the circumstances of this case, then, we conclude that no reasonable jury could have found that the government proved counts 1 through 4 of the indictment predicated on the mailing of NSF notices and charge notices.

We reach the same conclusion with respect to counts 5 and 6, which charge the mailings of the notice prior to prosecution

and the bank's insurance claim letter. The notice prior to prosecution was not mailed until two months after Taylor wrote the last of the worthless checks. By this time, the $60,000 loss sustained by Spenco had been converted into a loan, and the process of prosecution commenced. The insurance claim letter was not mailed until 9 months had passed and the bank had made every effort to recover the money from Taylor. It is clearly specious to assert that these mailings furthered the fraud. The cases cited by the government for the proposition that mailings incidental to filing a claim with an insurance company are sufficiently related to a scheme to defraud are inapposite. In both *United States v. Waterman,* 704 F.2d 1014, 1018–19 (8th Cir.1983) and *United States v. Moss,* 591 F.2d 428, 437 (8th Cir.1979), the charged mailings were incident to insurance claims sought to be collected by the perpetrators of the frauds, not the defrauded party. Collection of the proceeds of insurance in those cases was the means of achieving the fraud, not achieving recovery from the fraud. Finally, since Taylor's conviction for conspiracy is predicated on his conviction for the substantive crime of mail fraud, our reversal of his mail fraud convictions requires reversal of his conviction on the seventh count of conspiracy.

In *Freitag* former Chief Judge Floyd Gibson observed:

> We reiterate that in order to obtain a conviction under § 1341, the government must prove beyond a reasonable doubt that the defendant intentionally devised a fraudulent scheme and caused the use of the mails *for the purpose of carrying out the scheme.* We trust that these requirements will serve as a restraint on whatever tendency the government might have to prosecute anyone who ever bounced a check.

768 F.2d at 244 (emphasis added). On this basis we find that the government has not stayed within the restraints of section 1341 and we therefore reverse the conviction.

The judgment of conviction is ordered vacated; the cause is remanded to the district court with directions to dismiss the indictment.