John W. VAN DYKE, Jr., Petitioner,

v.

BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.

No. 88–5280.

United States Court of Appeals, Eighth Circuit.

Submitted March 17, 1989.

Decided June 8, 1989.

---

Mary E. Curtin, Minneapolis, Minn., for petitioner.

Douglas B. Jordon, Washington, D.C., for respondent.

Before FAGG and BEAM, Circuit Judges, and GUNN,* District Judge.

FAGG, Circuit Judge.

John W. Van Dyke, Jr., petitions for review of a final order issued by the Board of Governors of the Federal Reserve System (the Board). *See* 12 U.S.C. § 1818(h)(2) (1982). The order removed Van Dyke from his positions as president and director of the Toy National Bank of Sioux City, Iowa (Toy Bank or the Bank) and prohibited him from participating in certain banking affairs. *See id.* § 1818(e)(4)–(5) (1982). We affirm the Board's order.

Van Dyke maintained personal checking accounts at Toy Bank and another local bank, Norwest Bank of Sioux City, N.A. (Norwest). In early 1987, a Norwest officer told Van Dyke the Norwest Board of Directors insisted steps be taken to correct an unacceptably large overdraft balance in Van Dyke's Norwest account. Van Dyke as president could not be overdrawn at Toy Bank, *see* 12 C.F.R. § 215.4(d) (1987), and his credit there was at its maximum under federal regulations for bank officers, *see id.* § 215.5(c)(3) (1987). Van Dyke thus sought to arrange a loan from a third bank.

Even before completing the preliminary documentation for the loan, however, Van Dyke wrote a $50,000 Toy Bank check against a balance of approximately $355. He deposited this check at Norwest to cover er a check written on his account there, which already showed a six-figure overdraft balance. The next business day, Van Dyke conducted the same procedure in reverse by depositing a $51,000 Norwest check at Toy Bank to cover the $50,000 check written the day before. This manipulation gave the appearance of adding to Van Dyke's account in each bank. He repeated the exchange of checks during the following week; at that time, the checks were for $181,000 drawn on a $1340 balance at Toy Bank, followed by a $190,000 check drawn at Norwest. Van Dyke drew all of the checks without sufficient funds to cover the withdrawals from either account, and the bank loan he was in the process of seeking would have been insufficient on its own to cover the total overdrafts.

After a first bank declined to do so, Van Dyke eventually obtained the loan from another bank. The loan proceeds, along with funds from other private sources, cleared the Norwest overdrafts nearly two weeks after Van Dyke wrote the first insufficient funds check. The chairman of Toy Bank's audit committee asked Van Dyke to explain the transactions, and the committee reported the matter to the Toy Bank Board of Directors. The Toy Bank board promptly terminated Van Dyke's account privileges and notified the appropriate banking authorities of its action.

The Office of the Comptroller of the Currency (Comptroller) then initiated this administrative action to remove Van Dyke. *See* 12 U.S.C. §§ 1818(e)(1), 1813(q)(1) (1982). The removal notice charged Van Dyke with, among other things, engaging in a "check-kiting scheme" that justified his removal under section 1818(e)(1).

Following an evidentiary hearing, an administrative law judge (ALJ) issued a recommended decision. The ALJ concluded the first of three prerequisites for removal under section 1818(e)(1) had been met because Van Dyke's check-kiting scheme constituted: a violation of law (in this instance, 18 U.S.C. § 1344 (Supp. V 1987)); an un-

---

* The HONORABLE GEORGE F. GUNN, JR., United States District Judge for the Eastern District of Missouri, sitting by designation.

safe and unsound banking practice; and a breach of his fiduciary duty as a bank officer and director. Joint App. at 60. The ALJ also concluded section 1818(e)(1)'s second removal requirement was met because Van Dyke received financial gain when the Bank paid his overdrafts. *Id.* at 61. Indeed, the ALJ sagely observed that "Van Dyke used his position as the chief executive officer of Toy [Bank] to buy time to get out of a pressing financial bind." *Id.* at 38–39.

Turning to the third statutory requirement for removal, the ALJ described Van Dyke's actions in allowing his personal checking account to become overdrawn as "inexcusable," *id.* at 48. Despite having concluded Van Dyke's activity "contained all the elements of a violation of 18 U.S.C. § 1344," *id.* at 60, the ALJ determined those actions did not "demonstrate personal dishonesty nor [did] they seem to be of such a nature as to involve a disregard for the safety or soundness of the Bank," *id.* at 48. On this basis, the ALJ concluded the Comptroller had not satisfied section 1818(e)(1)'s third requirement and recommended the Board dismiss the removal action. The ALJ certified appropriate findings and conclusions to the Board for a determination whether the removal order should issue. *See* 12 U.S.C. § 1818(e)(5) (1982).

The Board on review adopted the ALJ's factual findings and agreed with the recommended decision in all but one respect. The Board, however, determined Van Dyke's conduct in perpetuating the check-kiting scheme demonstrated all three section 1818(e)(1) requirements, including personal dishonesty and willful disregard for the safety or soundness of the Bank. Accordingly, the Board issued its final decision ordering Van Dyke's removal.

On appeal, Van Dyke does not challenge any of the Board's determinations regarding the first and second requirements for removal under section 1818(e)(1). Instead, Van Dyke challenges only the Board's determination that his conduct violated the third statutory removal requirement. Specifically, Van Dyke contends: (1) the Board applied erroneous standards for determining personal dishonesty and willful disregard for the Bank's safety or soundness; and (2) the Board's decision that Van Dyke's conduct involving the insufficient funds checks showed personal dishonesty and willful disregard for the Bank's safety or soundness is not supported by substantial evidence on the record as a whole. *See* 12 U.S.C. § 1818(h)(2) (1982); 5 U.S.C. § 706(2)(E) (1982). We reject each of Van Dyke's contentions.

The Board determined the ALJ employed an unduly narrow standard for evaluating Van Dyke's culpability because the ALJ equated personal dishonesty with "an intent to gain at the expense of others," Addendum at 21. The Board took the view that while personal dishonesty (which is not defined in the statute) must be evaluated on a case-by-case basis, it need not amount to civil fraud and could encompass a broad range of conduct. According to the Board, this conduct may include: a " 'disposition to lie, cheat[,] or defraud; untrustworthiness; lack of integrity[;] * * * misrepresentation of facts and deliberate deception by pretense and stealth[;] * * * [or] want of fairness and [straightforwardness].' " *Id.* at 23 (quoted citations omitted); *see also id.* at 23–24 (discussing legislative history pertaining to personal dishonesty standard).

In light of the ALJ's finding that Van Dyke's check-kiting activity between his accounts at Toy Bank and Norwest "clearly fit[ ] within the prescription of [section] 1344," Joint App. at 38, the Board necessarily concluded Van Dyke's actions for purposes of this administrative proceeding "involve[d] fraud and a lack of integrity," Addendum at 24. Thus, the Board determined the Comptroller had shown Van Dyke engaged in acts of personal dishonesty within the meaning of section 1818(e)(1). We believe the Board's determination "is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *see also Stoddard v. Board of Governors,* 868 F.2d 1308, 1310 (D.C.Cir.1989).

Concerning the willful disregard for safety or soundness component of the third removal requirement, the Board noted it had previously accepted the ALJ's conclusion that the check-kiting scheme was an unsafe or unsound banking practice. Addendum at 25. To evaluate Van Dyke's culpability for those actions, the Board adopted a standard that incorporated the general method for identifying unsafe or unsound practices in the first instance. *See id.* at 26. The standard considers whether Van Dyke's conduct potentially exposed the Bank to an abnormal risk of loss or harm contrary to prudent banking practices. *See id.; see also First Nat'l Bank of Eden v. Department of the Treasury,* 568 F.2d 610, 611 n. 2 (8th Cir.1978) (per curiam). Applying this standard, the Board concluded Van Dyke's participation in the check-kiting scheme demonstrated "a willful disregard for the safety and soundness of the Bank." Addendum at 25 (footnote omitted). We do not disagree with the Board's conclusion. *See Chevron U.S.A. Inc.,* 467 U.S. at 843–44, 104 S.Ct. at 2781–82.

Turning to Van Dyke's remaining contention, he argues that even applying the Board's articulated standards, the record does not support a determination that his conduct was personally dishonest or showed a willful disregard for the Bank's safety or soundness. This contention is based on Van Dyke's assertion that because "Norwest * * * was always prepared to honor checks drawn by Van Dyke on his account at Norwest[,] * * * Van Dyke can hardly be found to have participated in a scheme or artifice to defraud * * * Toy Bank." Basically, Van Dyke argues that because he expected the loan proceeds immediately and because Norwest in the past permitted him significant overdraft privileges, his conduct in drawing admittedly insufficient funds checks at Toy Bank to advance his personal interests should be excused. Van Dyke also claims his personal dishonesty, if any, was directed only at Norwest and, thus, is irrelevant to his removal from Toy Bank.

Van Dyke's argument is unimpressive. He wrote the first insufficient funds check even before completing the necessary paperwork for the outside bank loan. He continued the scheme while seeking a bank loan that would not cover all the overdrafts the scheme produced. Van Dyke does not suggest he attempted to alert the board of directors (or anyone else at Toy Bank) to any extenuating circumstances surrounding his insufficient funds checks. Indeed, Van Dyke's scheme almost certainly would have collapsed if the bank loan and other private funds had failed to materialize or if Norwest had reversed its stance honoring Van Dyke's insufficient funds checks. In addition, to suggest that we focus exclusively on Van Dyke's dealings with Norwest in evaluating his conduct as a Toy Bank officer and director ignores the inherent multiple-bank characteristics of a check-kiting scheme. *See United States v. Taylor,* 789 F.2d 618, 621 (8th Cir.1986).

Van Dyke's substantial evidence argument also appears to ignore the Board's unchallenged determinations that: (1) his conduct toward Toy Bank embraced all the elements of a statutory violation that is premised on fraudulent conduct; and (2) by undertaking the check-kiting scheme, Van Dyke engaged in an unsafe and unsound banking practice connected directly to Toy Bank in accordance with section 1818(e)(1). Under these circumstances, we think it unrealistic for Van Dyke to suggest the Board is powerless to respond to an officer's manipulative, self-dealing activity until actual harm to the Bank occurs. We conclude the Board's decision that Van Dyke's conduct showed personal dishonesty and willful disregard for the Bank's safety and soundness is supported by substantial evidence on the record as a whole.

Accordingly, we affirm the Board's removal and prohibition order.