Berry F. LAWS, III, Plaintiff,

v.

UNITED MISSOURI BANK OF KANSAS
CITY, N.A., Defendant.

No. 91–0283–CV–W–6.

United States District Court,
W.D. Missouri,
Western Division.

Sept. 19, 1995.

Order Denying Reconsideration
Oct. 13, 1995.

R. Pete Smith and Jonathan A. Margolies, McDowell, Rice & Smith, Kansas City, MO and Richard H. Ralston and Dennis J. Dobbels, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, for Plaintiff.

Thomas E. Deacy, Jr., Deacy & Deacy, Kansas City, MO, James F. Duncan, Watson & Marshall, Kansas City, MO, Peter M. Granat, United Missouri Bank, Kansas City, MO, and Randolph G. Willis, Watson & Marshall, Olathe, KS, for Defendant.

## MEMORANDUM AND ORDER

SACHS, Senior District Judge.

This action arises out of events that occurred some months prior to the voluntary petition filed on February 13, 1987, by Kroh Brothers Development Company ("KBDC"), under Chapter 11 of the Bankruptcy Code.

Plaintiff's predecessors, KBDC and the Kroh Operating Limited Partnership ("KOLP"), filed the above-captioned action in order to recover a setoff and preferential transfers allegedly received by defendant United Missouri Bank of Kansas City, N.A. ("UMB"). Count 1 of plaintiff's second amended complaint seeks avoidance of an alleged setoff under 11 U.S.C. § 553(b). In Count 2, plaintiff alleges a preferential transfer under 11 U.S.C. § 547.[1] In Count 3, plaintiff alleges that KBDC was operating a check kiting scheme and seeks to recover an alleged preferential transfer to insider UMB under 11 U.S.C. § 547.[2] After extensive though fitful discovery by the various parties, this matter is currently before the court on cross-motions for summary judgment.

### Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts must be viewed in the light most favorable to the nonmoving party, who must be given the benefit of all reasonable inferences that may be made from the facts disclosed in the record. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153–61, 90 S.Ct. 1598, 1606–10, 26 L.Ed.2d 142 (1970); *Raschick v. Prudent Supply, Inc.*, 830 F.2d 1497, 1499 (8th Cir. 1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).

If a party is unable to make a sufficient showing as to some essential element of its case upon which it will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A party

1. Plaintiff alleges in Count 2 that on November 20, 1986, KBDC was indebted to UMB in the amount of $645,013.93. Plaintiff further alleges that KBDC subsequently made three transfers on account of the antecedent debt. This order refers to those transactions as the "November transactions."

2. Plaintiff alleges in Count 3 that on October 19, 1986, KBDC had a negative funds balance in its

UMB account in excess of $4,000,000. Plaintiff further alleges that this debt was repaid by a preferential transfer effected by either (1) a $7,000,000 loan from Commerce Bank of Kansas City, the proceeds of which were deposited into a KBDC checking account at Commerce, or (2) a $4,000,000 wire transfer from Commerce to UMB. These transactions will be referred to as the "October transactions."

seeking summary judgment bears the initial burden of demonstrating to the court that an essential element of the nonmoving party's case is lacking. *Id.* The burden then shifts to the nonmoving party to come forward with sufficient evidence to demonstrate that there is a factual controversy as to that element, or to explain why such evidence is currently not available. *Id.;* Fed.R.Civ.P. 56(e). If the nonmoving party fails to so respond, summary judgment, if appropriate, shall be entered against such party. Fed.R.Civ.P. 56(e). The nonmoving party must come forward with sufficient evidence to allow a reasonable jury to find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

## Count 1

Count 1 of the second amended complaint alleges an improvement in position by setoff, under 11 U.S.C. § 553(b), within 90 days prior to the filing of the bankruptcy petition. Plaintiff acknowledges that this court's prior ruling on the subject of UMB's insider status moves the preference period to one year preceding the bankruptcy filing. As a result, plaintiff concedes that he cannot recover on the 90–day improvement in position claim in Count 1. *See* Suggestions in Support of Plaintiff's Motion for Partial Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment at 57–58. Therefore, defendant is entitled to summary judgment on Count 1 of the complaint.

## Count 3

Plaintiff seeks to recover $4,000,000 from defendant under Count 3 of his complaint. Plaintiff's theory is that KBDC's negative funds balance in its UMB checking account on October 19, 1986, was a "debt" owed to UMB, and that KBDC's wire transfer of $4,000,000 on October 20 extinguished that debt and was therefore an avoidable preferential transfer within the meaning of 11 U.S.C. § 547(b). At no time during the period in question was there a conventional bank loan from UMB to KBDC.

Both parties recognize that in order to prevail on his preference claim, the trustee must establish the following elements: (1) there was a transfer of an interest of the debtor in property; (2) the transfer was to or for the benefit of a creditor; (3) the transfer was for or on account of an antecedent debt; (4) the debtor was insolvent at the time of the transfer; (5) the transfer was made between 90 days and one year before the date of the debtor's bankruptcy filing; and (6) the transfer enabled the creditor to receive more than it would have received in a Chapter 7 liquidation. See 11 U.S.C. § 547(b). The parties have focused their extensive briefing primarily on factors (1) through (3). Issues relating to factor (4) are still in discovery, but on "hold" at plaintiff's request. Oral argument has been heard on an unsigned draft of an opinion on the parties' cross motions for summary judgment.[3]

The $4,000,000 wire transfer that is the subject of Count 3 was made at 3:23 p.m. on Monday, October 20, 1986. The existence and extent of any antecedent debt owed by KBDC to UMB must accordingly be determined as of that time. Because the activity in the KBDC account on the days leading up to October 20 is quite crucial, attached to this order is an exhibit, which was submitted by the plaintiff at oral argument, that shows the account balances of KBDC for October 15, 16, 17, and 20, 1986. The columns showing checks returnable (but not returned) under the "midnight deadline" rule are omitted.

The exhibit contains UMB's ledger balance for the KBDC account and the balance under clearing house flow of funds rules. For purposes relevant here, clearing house rules govern the timing of provisional credit and settlement of deposits. When the bank received checks from a depositor, it transferred the checks to the clearing house and received provisional credit for the face amount of the checks. This provisional credit was available at noon on the business day that the deposits were submitted to the clearing house. Exhibit 1 to (1) Plaintiff's Statement of Uncontroverted Facts and Plaintiff's Response to

---

**3.** With respect to Count 3, the unsigned draft essentially concluded that defendant was entitled to summary judgment because no antecedent debt existed at the time of the $4,000,000 wire transfer. On further consideration the analysis is defective in light of the artificially broadened statutory language treating unmatured contingent obligations as debts.

Defendant's Statement of Allegedly Uncontroverted Facts and (2) Plaintiff's Suggestions in Support of His Motion for Partial Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, Affidavit of Donald E. Thomas, ¶ 6(a). This provisional credit was then extended to the depositor. *Id.* Final settlement occurred at midnight on the second business day following the grant of provisional credit. *Id.* at ¶ 6(b). UMB's practice was to submit deposits to the clearing house on the day following receipt, *id.* at ¶ 7, and thus it received provisional credit at noon on the day following the receipt of the deposits, which was then extended to its depositor.

■ At oral argument and in its briefs, UMB contends that whether an antecedent debt existed should be determined by the ledger balance for the KBDC account. Because the ledger account balance was positive during the relevant time frame, UMB claims that the wire transfer could not have been on account of an antecedent debt. Until settlement of deposited checks is final,[4] however, the depositor is treated as the owner of the deposited checks, even if credit is extended for the checks and a withdrawal against that credit occurs. Uniform Commercial Code ("U.C.C.") § 4–201.[5] It is perhaps accurate to say that, prior to final settlement, the bank has a contingent right to ownership of the deposited items (the contingency being the clearance of the checks) and the depositor has ownership of the checks subject to a condition subsequent. The reconstructed account using clearing house rules reflects this state of ownership. *In re Montgomery,* 123 B.R. 801, 810 (Bankr.M.D.Tenn.1991), *aff'd,* 136 B.R. 727 (M.D.Tenn.1992), *aff'd,* 983 F.2d 1389 (6th Cir.1993). Clearing house rules, moreover, have the same effect as an agreement between the parties unless specified otherwise. § 4–103(b). The existence of an antecedent debt will accordingly be determined by KBDC's account under clearing house rules.

■ KBDC obtained the funds for the $4,000,000 wire transfer from a $7,000,000 unsecured loan from Commerce Bank. UMB, relying on the earmarking defense to a trustee's claim of preferential transfer, asserts that the wire transfer merely changed the identity of the creditor to whom the debt was owed. The earmarking doctrine was discussed at length in *In re Bohlen Enterprises, Ltd.,* 859 F.2d 561 (8th Cir.1988). The following requirements must be met for the earmarking doctrine to apply: (1) an agreement between the new lender and the old debtor that the loan proceeds will be used to pay a specific antecedent debt; (2) performance of that agreement; and (3) when viewed as a whole, the transaction does not diminish the property of the estate. *Id.* at 566. UMB concedes that the purpose of the Commerce loan was "to inject current funds into the account at Commerce." Defendant UMB's Suggestions in Opposition to Plaintiff's Motion for Partial Summary Judgment, at 26. UMB does not allege that the disclosed purpose of the Commerce loan was to repay an antecedent debt *to UMB,* which renders the earmarking defense unavailable. *Matter of Smith,* 966 F.2d 1527, 1533 (7th Cir.1992).[6]

■ The Bankruptcy Code treats "debt" as the converse of a "claim." *In re Morton,* 43 B.R. 215, 219–20 (Bankr.E.D.N.Y.1984). Consequently, for purposes of the Bankruptcy Code, if UMB had a claim against KBDC, KBDC owed a debt to UMB. "Claim" is defined as a

 (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, ma-

---

4. *I.e.,* midnight of the second business day following the grant of provisional credit.

5. Section references will be to the U.C.C. unless otherwise noted.

6. As stated in the initial draft, this ruling does not necessarily represent my view of sound public policy or "what's fair," as between the bank and the general creditors. As an involuntary creditor the bank has a greater claim to sympathy, perhaps, than would a voluntary lender forced to disgorge a late repayment, for equality of treatment with other creditors. The Commerce loan, moreover, suggests that the general creditors did not suffer a diminution of the debtor's estate by reason of the flurry of activity on the days in question—but rather a substitution of creditors that does not quite qualify for application of the earmarking rule.

tured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured[.]

11 U.S.C. § 101(5). This definition is to be given the broadest construction possible. *Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 2153–54, 115 L.Ed.2d 66 (1991). Although "claim" is defined in the Bankruptcy Code, whether a right to payment exists is determined by state law. *In re Mandalay Shores Co-op. Housing Ass'n,* 54 B.R. 632, 635 (Bankr.M.D.Fla.1984). Applicable state law in this case is Article 4 of the U.C.C., codified at Mo.Rev.Stat. §§ 400.4–101—400.4–504.

Plaintiff contends that the debt KBDC owed to UMB at the time of the wire transfer is represented by the account balance at the close of business on Friday, October 17. This balance is negative $4,215,278.20. Since this "debt" exceeded the amount of the wire transfer on October 20, the entire amount of the wire transfer was on account of an antecedent debt, according to plaintiff.

■■■ Plaintiff's theory does have some appeal, but it appears to the court that this approach does not present a realistic picture of the amount of the depositor's debt, nor does it properly classify the debt. As noted *supra,* until final settlement, the depositor is treated as the owner of the deposited items. Because credit is extended by the bank prior to final settlement, however, the bank has a claim against the depositor (and the depositor has a debt to the bank) in the amount of the provisional credit extended, regardless of whether the depositor makes use of this credit. *In re Montgomery,* 123 B.R. at 809; *cf. In re Frigitemp Corp.,* 34 B.R. 1000, 1016 (S.D.N.Y.1983) (declining to treat provisional credit as creating a debtor-creditor relationship under normal circumstances, but suggesting that the result could differ in nonrou-

tine situations), *aff'd,* 753 F.2d 230 (2d Cir. 1985). The depositor's use of this credit by, *e.g.,* writing checks to third parties, does not necessarily alter the depositor's obligation to the bank, even if those checks are paid by the bank, although it does create a liability to the third parties. § 3–414 (drawer liability); *In re Hudson Valley Quality Meats, Inc.,* 29 B.R. 67, 75 (Bankr.N.D.N.Y.1982). The use of provisional credit creates a liability to the bank only if the bank pays checks that result in the depositor's account being overdrawn.[7] *See In re Hudson Valley Quality Meats, Inc.,* 29 B.R. at 74–75 (application of provisional credit can increase depositor's liability as well as extend it to third parties). The bank has a claim against the depositor for the amount of the overdraft, and the depositor has a corresponding debt. *See id.* The total amount of the debt, therefore, is the amount of provisional credit extended, plus the checks and other account debits paid by the bank that exceed this grant of provisional credit.

■■■ UMB, asserting a security interest in the deposited checks and their proceeds, contends that any antecedent debt that did exist was fully secured. Classification of the debt is covered by § 4–210(a), which states:

A collecting bank has a security interest in an item and any accompanying documents or the proceeds of either:

(1) in case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;

(2) in case of an item for which it has given credit available for withdrawal as of right, to the extent of the *credit given* whether or not the credit is drawn upon or there is a right of charge-back; or

(3) if it makes an advance on or against the item.

No security agreement is necessary for the creation of this security interest, § 4–210(c)(1); attachment occurs automatically once the statutory prerequisites are met. § 4–401(a).

---

7. The bank is entitled to charge a depositor's account even if the charge creates an overdraft.

§ 9–203(2). This security interest is perfected without the necessity of filing, § 4–210(c)(2), and it has priority over competing interests. § 4–210(c)(3). When UMB provisionally extended credit to KBDC, therefore, it took a security interest in the deposited checks. *See Frigitemp,* 34 B.R. at 1015. Whether the bank had a security interest is critical in this case because a transfer to a fully secured creditor is not a preference since there is no "preferential effect." *Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.),* 990 F.2d 551, 554 (10th Cir.1993); *Henderson v. National Bank of Commerce (In re Al–Ben, Inc.),* 156 B.R. 72, 75 (Bankr. N.D.Ala.1991). If UMB had a secured claim against KBDC equal to or greater than $4,000,000 at the time of the transfer, the transfer cannot be reclaimed as a preference.[8]

 Plaintiff seeks to sidestep UMB's assertion of a security interest by contending that, since the deposited checks were part of a kiting scheme, they lacked value and, accordingly, any security interest held by UMB was also valueless. UMB's status as a secured creditor in a liquidation proceeding would be governed by 11 U.S.C. § 506. A lien is valid under that section except to the extent that it secures a claim that is not an allowed secured claim. 11 U.S.C. § 506(d). For purposes relevant to this case, a claim is an allowed secured claim "to the extent of the value *of such creditor's interest* in the estate's interest in [the secured] property." 11 U.S.C. § 506(a) (emphasis added). This claim is not affected by a decline in the value of the property subject to the claim subsequent to judicial valuation, *Dewsnup v. Timm,* 502 U.S. 410, 417, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992), and the creditor is entitled to the benefit of any appreciation occurring prior to foreclosure. *Id.* In this Circuit, the creditor's interest is "valued in light of the purpose of the valuation and the proposed disposition or use of the collateral." *In re Trimble,* 50 F.3d 530, 531 (8th Cir. 1995).[9]

Plaintiff has cited many decisions in support of his assertion that kited checks are "worthless." *United States v. McKinney,* 822 F.2d 946 (10th Cir.1987); *United States v. Taylor,* 789 F.2d 618 (8th Cir.1986); *United States v. Sher,* 661 F.2d 34 (3d Cir.1981); *Suhl v. United States,* 390 F.2d 547 (9th Cir.1968); *Falconi v. FDIC,* 257 F.2d 287 (3d Cir.1958); *Stevens v. United States,* 227 F.2d 5 (8th Cir.1955). However, most of the language cited is derogatory commentary about perpetrators of Ponzi schemes in criminal prosecutions of the depositor; none arose under the Bankruptcy Code or dealt with the security interest of a victim in a kiting operation.[10] *See United States v. McKinney,* 822 F.2d at 948 (prosecution for misappropriation of funds by check kiting); *United States v. Taylor,* 789 F.2d at 619 (mail fraud prosecu-

---

**8.** Any thought that UMB was enjoying a double payment, consummated by the subsequent clearance of the batches of checks that were in the process of collection, is countered when it is remembered that this simply built up KBDC's account and did not become UMB's property. Moreover, even if a suspicion of transfers in fraud of creditors might unsoundly persist, plaintiff's case is not based on such an assertion.

**9.** An alternate approach measures the creditor's interest by the wholesale value of the collateral. *In re Trimble,* 50 F.3d at 531 (citing cases).

**10.** Plaintiff is correct that courts have frequently referred to checks drawn on accounts with insufficient funds as "bad checks" or "worthless checks," even in circumstances where there have been promises to deposit sufficient funds to cover the checks. *See, e.g., United States v. Taylor,* 789 F.2d at 623. It may be more precise usage to call checks worthless when there is "no reasonable prospect of paying" them. *Stevens v. United States,* 227 F.2d at 6. Like "junk bonds," they

may turn out to be valuable, in that they result in the payment of money. Terming insufficient funds checks as "worthless" is less exaggerated than the claim of some tax protestors that Federal Reserve notes are "worthless" because they are not payable in bullion. But when real money (legal tender) is likely to be paid as the result of a temporarily successful check kite, it is difficult to say realistically or in an economic sense that the checks are wholly worthless.

Plaintiff offers no authority showing that a bank that has *not* been trapped at the end of a kiting scheme is nevertheless entitled to *full* damages in the face value of the checks received and deposited on an implicit misrepresentation that there are adequate funds with the drawee bank. That would be the acid test of whether the kited checks are "worthless." In other words, in a kiting situation, substantial damage exposure moves back and forth; it does not *fully* affect *all* of the banks *all* of the time.

tion for role in a check kiting scheme); *United States v. Sher*, 661 F.2d at 34 (prosecution for overvaluing securities in connection with a check kiting scheme); *Suhl v. United States*, 390 F.2d at 548 (prosecution for mail fraud and other charges related to a check kiting scheme); *Falconi v. FDIC*, 257 F.2d at 288–89 (suit by depositor against FDIC to recover amount appropriated from his account because of alleged connection with a check kiting scheme); *Stevens v. United States*, 227 F.2d at 6 (mail fraud prosecution of perpetrator of a check kiting scheme).

The existence and valuation of a security interest was apparently not argued in any of the *Montgomery* cases nor was it addressed by the bankruptcy, district, or appellate court.[11] The *Smith* court did recognize the security interest of the collecting bank. *Matter of Smith*, 966 F.2d at 1530. The valuation issue was not before the court, however, since the preference claim was asserted against the payee, not the bank. It is notable that, even though the deposited check was dishonored and was referred to by the court as a "bad" check, the court did not treat the bank's security as worthless. Rather, the court appeared to accept the trustee's argument that the security interest attached to the depositor's ability to control disposition of the provisionally credited funds. *Id.* at 1530–31.[12] The value of this interest would thus be equal to the unrestricted provisionally credited funds, since the depositor could exercise control over this amount. Following that approach, UMB would have a secured claim of $7,993,479.64, the amount of unrestricted provisional credit extended to UMB at the time of the $4,000,000 wire transfer.

The security interest of the collecting bank was an alternate basis for the holding in *Frigitemp. In re Frigitemp*, 34 B.R. at 1015–16. No kiting was present in that case, however. It thus appears that, other than general valuation principles, no clear guidance exists for the situation at hand. Treating the bank's security interest in the checks as "worthless" is probably unjustified, though, particularly in light of comment 3 to § 4–210, which notes the importance of the security interest in cases of noncollection. If plaintiff's theory were followed, the security interest would have value only when the checks were collected, which would be of little use to the lender.

■ Plaintiff also asserts that no proceeds resulted from the kited checks. Section 4–210, in addition to giving a collecting bank a security interest in items presented for collection, gives the bank an interest in the proceeds of those items. " 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." § 9–306(1). At the time UMB credited KBDC's ledger account, its security interest was in the deposited checks. *Matter of Stiennon*, 73 B.R. 905, 908 (Bankr.W.D.Wis.1987); *see also* Richard Sauer, "Special Problems of Banks With Bankruptcy Debtor Customers," 61 Am. Bankr.L.J. 95, 122–23. However, contrary to plaintiff's contention, when UMB received credit for the items from the clearing house, it received "proceeds" within the meaning of § 9–306. *Matter of Stiennon*, 73 B.R. at 908 (Bankr.W.D.Wis.1987); *see also Realty Growth Investors v. Commercial and Industrial Bank of Memphis, Tennessee*, 370 So.2d 297, 302 (Ala.Civ.App.1979) (exchange with the clearing house of deposited checks for credits creates proceeds from the deposited checks). UMB then transferred those proceeds to KBDC's account in the form of provisional extensions of credit. Accordingly, at the time of the wire transfer, UMB's security interest was not in the checks, but in

11. The bank claimed that a line of credit was backed by a security interest in real property, but the bankruptcy court found that the bank had offered no evidence to rebut the trustee's proof that the bank was undersecured and thus had received more on its line of credit than it would have received in a Chapter 7 proceeding. *In re Montgomery*, 123 B.R. at 817. The issues on appeal were whether the voidable transfer was adequately identified, whether there was a transfer to the bank of an interest of the debtor in property, whether there was a diminution in the value of the debtor's estate, and the propriety of the prejudgment interest award. *In re Montgomery*, 983 F.2d at 1392; *In re Montgomery*, 136 B.R. at 730.

12. The bank did not make an exchange of the deposited checks and thus no proceeds were involved. *See infra.*

the proceeds—the credits received from the clearing house. I have not heard and cannot imagine a sound argument that the security interest in the credits does not have dollar-for-dollar value for present purposes simply because the credits were subject to revocation if the collections miscarried. The additional fact-finding that would be required to place a value on the checks is unnecessary.[13]

██ The $4,000,000 wire transfer occurred at 3:23 p.m. on October 20. By that time, UMB's security interest had transferred to the proceeds from the clearing house exchange, from which it had received full value for the face amount of the checks. The amount of UMB's secured claim was $7,993,479.64, computed as follows: proceeds of the $3,952,000 in checks that were transferred to the clearing house on October 17 (on which final settlement was not made until midnight on October 21), plus the proceeds of the $4,041,479.64 in checks that were transferred to the clearing house on October 20 (on which final settlement was not made until midnight on October 22). Any checks paid by UMB that exceeded the amount of provisional credit[14] would be added to this amount

to determine the total amount of debt KBDC owed to UMB. The court need not make this computation, however, because the $4,000,000 transfer did not enable UMB to receive more than it would have in a Chapter 7 liquidation since the amount of its security interest in the proceeds of the checks in the process of collection greatly exceeded the amount of the transfer.

Therefore, to the extent plaintiff has alleged an antecedent debt of approximately $4,000,000 on October 19 and a preferential wire transfer of $4,000,000 on October 20,[15] plaintiff cannot prevail under § 547. Defendant is entitled to summary judgment on Count 3.[16]

## Count 2

██ In Count 2 of the complaint, plaintiff seeks to recover a total of $645,013.93. Plaintiff's theory is that KBDC had a negative collected balance in its UMB checking account on November 20, 1986, and that KBDC made transfers to the account on November 21, 23, and 24, 1986, which constituted preferential transfers on account of an antecedent debt. Unlike the large wire

13. A contrary ruling would probably create a jury issue as to the "street value" of kited checks—a bizarre but not unprecedented undertaking. Courts routinely hear evidence of the street value of illegal drugs, and occasionally hear about the discounted value of stolen goods, high quality counterfeit currency and the like. In the absence of expert testimony, a jury could "pick a number" after hearing evidence about the likelihood that checks will clear and other pertinent facts.

14. This portion of the debt would be treated as unsecured, in the absence of an agreement otherwise between the parties.

15. The court will not discuss at length plaintiff's alternative contention that $7,000,000 worth of loan proceeds deposited into an account at Commerce Bank constituted the preferential transfer to UMB. The court is aware of no relevant law that would support plaintiff's theory that UMB was a beneficiary of that particular deposit. Moreover, plaintiff acknowledges that he only asserted the $7,000,000 transfer theory "in anticipation that UMB might contend that the $7,000,000 deposit into the KBDC Commerce account repaid the debt." Response to UMB's Summary Judgment Motion at 12. UMB has not made that anticipated contention; therefore,

plaintiff appears to have effectively abandoned the $7,000,000 claim.

16. Defendant's "conduit" theory of defense is debatable with respect to the October transactions. The strong evidence of a check kiting scheme in October, in addition to the interest charges on KBDC's negative collected balance from June 1986 through October 1986, conceivably distinguish the October transactions from the "conduit" transactions in O'Neal v. Southwest Mo. Bank (In re Broadview Lumber Co., Inc.), 168 B.R. 941, 963 (Bankr.W.D.Mo.1994). Judge Federman's analysis of 11 U.S.C. § 550 in Broadview is applicable insofar as it addresses the question of whether a bank is a "transferee." The trustee seeks to avoid a transfer under § 547 of the Code, and to recover money under 11 U.S.C. § 550. Receipt of money by a mere conduit would not permit the trustee to prevail under either section. The decision in Broadview clearly stands for the proposition that a trustee may not recover funds deposited with a conduit. Broadview, 168 B.R. at 963–64. Moreover, receipt of money by a conduit, rather than a transferee, would not qualify as a "transfer of an interest of the debtor ... to or for the benefit of a creditor" under 11 U.S.C. § 547(b). For the reasons set forth above, however, it is not necessary to reach the question of whether UMB was

transfer discussed in Count 3, the "transfers" referred to in Count 2 were bank-to-bank payments on checks previously deposited for collection. The court concludes, however, that the defendant bank was not a beneficiary of funds (which simply replenished its depositor's account) and was in fact nothing more than a "conduit" or agent receiving funds, not a "transferee" of KBDC's funds.

As noted above, defendant's contention that it was a mere "conduit" for KBDC funds is not conclusively supported by the authorities, with respect to the October transactions. However, the November transactions can be distinguished from the October transactions in at least two important ways. First, plaintiff has not alleged a check kiting scheme in Count 2. Although plaintiff hints at such a scheme in his briefs, none was alleged in the complaint. Thus, the applicability of *Montgomery* (the Sixth Circuit litigation) is questionable, at best.

■ Second, in a provisional credit situation when no fraud has been alleged, the conduit analysis of *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1200–01 (11th Cir.1988), and *Broadview*, 168 B.R. at 963, is highly relevant. In *Broadview*, Judge Federman found no evidence that Southwest Missouri Bank or Mercantile Bank exercised any dominion over funds deposited into the debtor's accounts. *Broadview*, 168 B.R. at 963. The banks did not have a current right to seize or disburse the money for their own benefit, and were therefore nothing more than intermediaries, or conduits, of the debtor's funds. *Id.* They were not "transferees" of those funds. *Id.* Similarly, this court finds that UMB was not a transferee of KBDC funds in November, and that plaintiff therefore can neither avoid the alleged transfers nor recover the property allegedly transferred. *See Chase & Sanborn*, 848 F.2d at 1200. As in *Chase & Sanborn*, when UMB received funds

from KBDC in November 1986, UMB merely deposited the funds into KBDC's checking account and KBDC used the funds to pay certain checks drawn on the account. *Id.* at 1201. Unlike the characterization sometimes made in kiting cases, the transactions at issue in Count 2 "did not create a real debt." *Id.*

■ The issue of "benefit" under 11 U.S.C. § 547(b)(1) is closely related to the issue of UMB's role as conduit. *See, e.g., Bonded Financial Services v. European Amer. Bank*, 838 F.2d 890, 893 (7th Cir. 1988).[17] The court finds that UMB received no benefit from the alleged preferential transfers in November. A distinction between the October and November transactions is that UMB apparently charged no interest to the KBDC account in November. Suggestions in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment at 9. UMB arguably was more than a conduit in October, because it charged the KBDC account $4,269.76 in interest during that month. Moreover, UMB charged the KBDC account more than $40,000 in interest prior to October. Such evidence lends support to the trustee's claim that UMB perceived and intended "that the use of uncollected funds in the [account] rendered [KBDC] the Bank's debtor." *Montgomery*, 123 B.R. at 811.[18] Such evidence also supports a claim that UMB derived some benefit from the October transactions. In November, however, the bank charged no interest to the account. The statutory presumption of agency status, referred to in *Bonded Financial Services*, 838 F.2d at 893, cannot be rebutted by the materials before the court.[19]

Plaintiff has failed to prove "transfers" to UMB in November "for the benefit of" UMB,

merely a conduit with respect to the October transactions.

17. The court, writing through Judge Easterbrook, held that European American Bank, acting as a financial intermediary, "received no benefit." *Id.* The Bank "held the check only for the purpose of fulfilling an instruction to make the funds available to someone else." *Id.*

18. The court's conclusion in *Montgomery* was supported by the bank's assessment of "analysis charges" against the negative collected balance. *Id.*

19. As the Eight Circuit has noted, the presumption applies to all collecting banks, including a depositary bank. *Alta Vista State Bank v. Kobliska*, 897 F.2d 930, 933 (8th Cir.1990).

and therefore defendant is entitled to summary judgment on Count 2 of the complaint.

Accordingly, for the reasons set forth above, it is hereby

ORDERED that plaintiff's motion for partial summary judgment is DENIED. It is further

ORDERED that defendant's motion for summary judgment on all three counts of plaintiff's second amended complaint is GRANTED.

| | Ledger Balance | Funds Flow Under Clearing House Rules |
|---|---|---|
| WEDNESDAY, OCTOBER 15, 1986 | | |
| Negative collected funds as of the opening of business | | (3,409,472.07) |
| Provisional credit for KBDC deposit of 10/14/86 | | 3,686,438.15 |
| Opening ledger balance 10/15/86 | 276,966.08 | 276,966.08 |
| Checks deposited by KBDC | 3,956,359.89 | |
| Checks presented for payment | (4,157,324.10) | (4,157,324.10) |
| Wire transfers out | (32,635.54) | (32,635.54) |
| Closing balance 10/15/86 | 43,366.33 | (3,912,993.56) |
| THURSDAY, OCTOBER 16, 1986 | | |
| Checks deposited by KBDC | 3,952,000.00 | |
| Provisional credit for KBDC deposit of 10/15/86 | | 3,956,359.89 |
| Checks presented for payment | (3,882,175.01) | (3,882,175.01) |
| Closing balance 10/16/86 | 113,191.32 | (3,838,808.68) |
| FRIDAY, OCTOBER 17, 1986 | | |
| Checks deposited by KBDC | 4,041,479.64 | |
| Checks presented for payment | | (4,316,454.52) |
| Provisional credit for KBDC deposit of 10/16/86 | | 3,952,000.00 |
| Wire transfers out | (12,000.00) | (12,000.00) |
| NSF charge | (15.00) | (15.00) |
| Closing balance 10/17/86 | 4,142,655.96 | (4,215,278.20) |
| MONDAY, OCTOBER 20, 1986 | | |
| Checks deposited by KBDC | 1,105,000.00 | |
| Checks presented for payment | (9,232,133.03) | (4,915,678.51) |
| Provisional credit for KBDC deposit of 10/17/86 | | 4,041,479.64 |
| Wire transfers in | 4,000,000.00 | 4,000,000.00 |
| | 814,966.00 | 814,966.00 |
| Miscellaneous credit | 15.00 | 15.00 |
| Closing balance 10/20/86 | 830,503.93 | (274,496.07) |

## ORDER

Plaintiff in the above-captioned action has filed a timely motion for reconsideration of the court's order dated September 19, 1995, which granted defendant's motion for summary judgment on all three counts of plaintiff's second amended complaint. Plaintiff disputes the court's conclusion that defendant was a fully secured creditor at the time of the challenged wire transfer.

Plaintiff contends that, despite the court's allegedly erroneous valuation conclusion,[1] de-

---

1. Contrary to plaintiff's contention, the court did not assign a value to the checks deposited for collection. The court valued the proceeds only, and noted the potential difficulties in placing a value on the checks.

fendant had a limited security interest because collection and application had already occurred with respect to the deposited checks except for the Monday deposits of $1,105,000. This assertion disregards the court's analysis of the collection and settlement process.

Defendant received provisional credit from the clearinghouse at noon on the business day of submission. Under the statute, defendant had a security interest in these credits, which were proceeds of the deposited checks, until final settlement, which occurred at midnight on the second business day following the grant of provisional credit.

■ Plaintiff is essentially contending that the court should treat the security interest in the credit representing checks being collected as somehow being disbursed or eliminated because batches of other checks drawn on the debtor's account were also received. This assertion is inconsistent with U.C.C. § 4-210(c), which states that: "So long as the bank does not receive final settlement for the item ... the security interest continues to that extent and ... (3) the security interest has priority over conflicting perfected security interests in the item, accompanying documents or proceeds." Plaintiff offers no authority for allowing the receipt of checks drawn on an account prior to final settlement to extinguish or take priority over the bank's security interest.

Plaintiff's theory is also unsound in light of the presentment rules governing the October 17 and 20 transactions. Final settlement on the $4,316,464.52 October 17 presentment and the $4,915,678.51 October 20 presentment did not occur until midnight on October 21 and 22, respectively. Until this time, UMB had an absolute right to return these items to the clearinghouse for full credit. U.C.C. § 4-301. At the time of the chal-lenged wire transfer, therefore, UMB was free to return the presentments to the clearinghouse and realize upon its security interest.

The argument heretofore presented by plaintiff has been that checks in collection (kited checks) were the antecedent debt problem that the $4 million wire transfer was attempting to remedy. Much time and effort has been devoted to this subject. Plaintiff now transfers attention to checks presented for payment *from* the depositor, so that it would appear that a large overdraft was in prospect.[2] If the $4 million wire transfer were now to be considered an attempt to avoid a large overdraft on checks issued by the debtor, it successfully accomplished that purpose, and would not appear to be preferential in nature.[3] Accordingly, it is hereby

ORDERED that plaintiff's motion for reconsideration is DENIED.

---

2. Under this revisionist analysis, the security interest in the provisional credit simply remained unaffected until the credit became fixed by passage of the midnight deadline.

3. The court does note, however, that plaintiff asserts an antecedent debt of several hours' duration. This issue, if timely presented, may be resolved on appeal. It was debated in sketchy briefing after judgment was entered.