FILED
United States Court of Appeals
Tenth Circuit

June 9, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

WAKON IRON REDCORN, JR., and
BRADLEY N. FROST,

Defendants-Appellants,

———————————————

STATE OF OKLAHOMA *ex rel.* KIM
HOLLAND, Insurance Commissioner,
in her capacity as Oklahoma Insurance
Commissioner and as receiver for
Heritage National Insurance Company,

Amicus Curiae.

Nos. 06-5206 and 06-5207

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 05-CR-001-SPF)**

Kenneth P. Snoke, Assistant United States Attorney (David E. O'Meilia, United States Attorney, with him on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.

Robert R. Nigh, Jr., (Clark O. Brewster with him on the brief), Brewster & De Angelis, Tulsa, Oklahoma, for Defendant-Appellant Bradley N. Frost.

Stanley D. Monroe, Attorney at Law, Tulsa, Oklahoma, for Defendant-Appellant Wakon Iron Redcorn, Jr.

Daniel D. Draper, III, Draper Law Firm, Owasso, Oklahoma, and Michael W. Ridgeway, General Counsel, Oklahoma Insurance Department, Oklahoma City, Oklahoma, for Amicus Curiae the State of Oklahoma *ex rel.* Kim Holland, Insurance Commissioner, in support of Plaintiff-Appellee.

---

Before **O'BRIEN**, **BALDOCK** and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Appellants Bradley N. Frost and Wakon Iron Redcorn, Jr., were the president and the chief financial officer of Heritage National Insurance Company (HNIC), an Oklahoma health insurer. Using their positions, they managed between them to bleed the company of some $1.7 million. On January 6, 2006, they were indicted in federal district court on charges of embezzlement from a health care benefit program, wire fraud, and money laundering. A jury found them guilty, and each was sentenced to concurrent terms of 72 months' imprisonment on every count. In this direct appeal, we affirm in part, reverse the wire fraud convictions, and remand for resentencing.

# I. BACKGROUND

HNIC sold life, accident, and group health insurance. First licensed to sell insurance in Oklahoma in 1974,[1] by the late 1990s HNIC's fortunes had fallen and it was forced into receivership by the Oklahoma Insurance Department (OID). Mr. Frost and another investor acquired the company, and they, along with Mr. Redcorn, rehabilitated it out of receivership and into the black. As of mid-1999, HNIC was owned by a holding company of which Mr. Frost owned half; a different investor, Steven Silverstein, along with his wife, owned the other half; and Mr. Redcorn had an option to acquire part of their interests. Mr. Frost served as HNIC's president, and Mr. Redcorn as the secretary/treasurer and CFO; Mr. Silverstein was HNIC's chairman and the CEO of the holding company. By 2000, HNIC's revenues had climbed to over twelve million dollars a year. In that year HNIC also purchased the business book of a failing Texas insurer, giving it interstate reach.

From early 2000, however, Mr. Frost and Mr. Redcorn started removing money bit by bit from HNIC. They began by "investing" HNIC moneys in other companies they controlled. They would also write checks to themselves on HNIC accounts and designate the payments on the books as "loans" or "consulting fees."

---

[1] The company was known as First Family Life Insurance until 1991, then as Access Insurance until 1999.

Although they would pay back most of the alleged loans and investments, the evidence showed that they retained over $400,000 for themselves. Then in August of that year Mr. Frost opened a new bank account in HNIC's name at Bank of America. The account sat, unused, until March 2001, when Mr. Redcorn instructed Kendra Blevins, an employee in HNIC's financial department, to start diverting incoming premium payments away from the company's ordinary accounts and into the separate account. He told her that he and Mr. Frost were planning to save up a war chest of one million dollars to sue their partner Mr. Silverstein, whom they suspected of stealing from the company. Well over a million dollars was funneled into the account over a period of only weeks. Then, in mid- and late-April 2001, Mr. Redcorn and Mr. Frost withdrew $500,000.00 apiece in checks payable to themselves, recording the payments on HNIC's books as short-term investments. They deposited the funds briefly in their private bank accounts, then shifted them to personal investment accounts with a broker in Florida. They never sued Mr. Silverstein and never returned the money to HNIC.

Around this time, federal authorities and state regulators were starting to take an interest in HNIC's finances. The FBI interviewed Mr. Redcorn in January 2001 as part of an investigation of Mr. Silverstein, who was, apparently, independently engaged in a multi-million-dollar bank fraud scheme involving

check kiting with HNIC moneys.[2]  The focus turned to Mr. Redcorn and Mr. Frost, however, after the Oklahoma Insurance Department began its investigation. At the beginning of May 2001, the OID sent a financial examiner, Hallie Burnett, to HNIC to conduct a review of its records.  In late summer, the OID ordered HNIC to be placed under supervision, and appointed Ms. Burnett as conservator with authority to prevent the removal of any more money from the company.  On November 11, 2001, a court ordered HNIC into receivership.  All its assets were auctioned off, and the insurance guaranty associations of Oklahoma and Texas had to shoulder thousands of outstanding obligations to persons HNIC had insured—$19 million dollars' worth.

On January 26, 2006, Mr. Frost and Mr. Redcorn were indicted on one count of health care fraud in violation of 18 U.S.C. § 669 (for taking money from a health insurance company), four counts of wire fraud in violation of 18 U.S.C. § 1343 (for transferring the money using interstate wires), and a total of twenty-six counts of money laundering in violation of 18 U.S.C. § 1957(a) (for a variety of financial transactions using the stolen money).  At their eight-day trial in

---

[2] On November 9, 2005, Mr. Silverstein was separately indicted on one count of health care fraud and twenty-seven counts of money laundering. Indictment, *United States v. Silverstein*, No. 05-CR-165-SPF (N.D. Okla. Nov. 9, 2005).  On September 13, 2006, the indictment was dismissed without prejudice on the government's motion.  Order, *id.* (Sept. 13, 2006).

December 2005, the defendants claimed that the "investments" they had made for themselves with company money were authorized by the minutes of a 1991 board meeting of HNIC's predecessor, and that the funds they had taken in April 2001 were a legitimate buyout or severance because they were planning to leave the company. They also attacked the OID's special investigator Hallie Burnett as incompetent, possibly corrupt, and the dupe or cat's-paw of Steve Silverstein.

But the jury returned a verdict of guilty on all counts on December 16, 2005. Mr. Redcorn and Mr. Frost now appeal, and raise four chief areas of argument: that the indictment was legally insufficient, that the evidence adduced at trial was insufficient to establish their guilt, that they were entitled to a new trial because of evidence they received afterward, and that their sentences violated the Constitution. We reject all these arguments except as to the sufficiency of the evidence to establish the elements of wire fraud.

## II. SUFFICIENCY OF THE INDICTMENT

"'An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense.'" *United States v. Chisum*, 502 F.3d 1237, 1244 (10th Cir. 2007) (quoting *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997)). "'[I]t is generally sufficient that

an indictment set forth an offense in the words of the statute itself, as long as those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *United States v. Hathaway*, 318 F.3d 1001, 1009 (10th Cir. 2003) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  Therefore, where the indictment quotes the language of a statute and includes the date, place, and nature of illegal activity, it "need not go further and allege 'in detail the factual proof that will be relied upon to support the charges.'" *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988) (quoting *United States v. Crippen*, 579 F.2d 340, 342 (5th Cir. 1978)).  We review the sufficiency of an indictment *de novo*, *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006), but a challenge to the indictment is not a vehicle for testing the government's evidence. "Rather, '[a]n indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true.'" *Id.* (quoting *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994)).

## A.  Count 1:  Health Care Fraud

Count 1 of the indictment charged Appellants with violation of 18 U.S.C. § 669, which outlaws embezzlement of "any of the moneys . . . or other assets of a health care benefit program."  "Health care benefit program" is defined in another

section:

> [T]he term "health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

18 U.S.C. § 24(b). Appellants contend that a health insurance company cannot be a health care benefit program as so defined, and thus that because the indictment alleged that HNIC was both a health insurance company *and* a health care benefit program it did not properly state a violation of § 669. They assert also that federal prosecution of insurance-related crimes under § 669 is precluded by the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), which leaves insurance regulation generally in the hands of the states.

### *1. Inconsistency of Allegations*

Count 1 of the indictment alleges, in its entirety:

> From on or about April 3, 2000 and continuing through June 7, 2001, in the Northern District of Oklahoma and elsewhere, REDCORN and FROST, defendants herein, aiding and abetting each other, did knowingly and willfully embezzle, steal or otherwise convert to the use of a person other than the rightful owner and did intentionally misapply, approximately $1,264,000.00 of the monies, funds, premiums, credits, and other assets of *HNIC, a health care benefit program* as defined in Title 18, United States Code, Section 24b [sic].
> All in violation of Title 18, United States Code, Sections 2(a) and 669.

R., Vol. I, Doc. 3, at 4 (emphasis added)[3]. This sets forth the charged offense in the words of the statute itself, and contains the date, place, and nature of the charged illegal activity. It is thus entirely sufficient to give the defendants fair notice and enable them to determine whether to raise a double jeopardy defense. That is all that our precedents require.

The defendants point out, however, that the introduction to the indictment describes HNIC as "an insurance company doing business in Oklahoma." *Id.* at 3. They contend that it is not possible for a private insurance company to be a "health care benefit program" as that term is defined in the Act, because a company is not a "plan or contract." We are not necessarily persuaded. A private insurance company, which makes payments to providers for the cost of medical services, appears to be the private equivalent of Medicare or Medicaid. These are unquestionably health care programs under § 24(b). *See United States v. Morgan*, 505 F.3d 332, 341–42 (5th Cir. 2007); *United States v. McGovern*, 329 F.3d 247, 248–49 (1st Cir. 2003) (collecting cases). But there are no precedents squarely on point, and this seems to be an open question. We need not answer it here. Whether HNIC actually was an insurance company is a matter of the evidence, not the indictment, and if it was not, then the issue is moot.

---

[3] Mr. Frost and Mr. Redcorn have designated records on appeal that are identical in nearly all respects. Citations correspond to both records.

Appellants' attempt to characterize the problem as one of internal inconsistency within the indictment gets them no farther. To succeed on such an argument they would have to demonstrate not only that insurance companies are not necessarily health care benefit programs, but that it is impossible for an insurance company also to be a health care benefit program. In light of the existence of hybrid arrangements like health maintenance organizations, which are both insurers and health care providers, we do not think this is impossible. (We are not saying that HNIC was a health maintenance organization, only that there is no logical inconsistency within the indictment.)

Moreover, even if there were an inconsistency between the indictment's prefatory averment that HNIC was an insurance company and the averment in Count 1 that it was a health care benefit program, this would not render Count 1 insufficient. "'Each count in an indictment is regarded as if it was a separate indictment.'" *United States v. Powell*, 469 U.S. 57, 62 (1984) (quoting *Dunn v. United States*, 284 U.S. 390, 393 (1932)). There is no need to look beyond the borders of a particular count to determine what offense is charged; indeed, it is generally improper to do so except where a count incorporates other allegations expressly, as permitted by Federal Rule of Criminal Procedure 7(c)(1). *See United States v. Caldwell*, 302 F.3d 399, 412 (5th Cir. 2002); *United States v.*

-10-

*Stoner*, 98 F.3d 527, 535 (10th Cir. 1996). An indictment need not contain introductory or prefatory matter at all, *see* Fed. R. Crim. P. 7(c)(1), so if it does such matter is perforce superfluous unless expressly incorporated into one of the counts. "'A part of the indictment unnecessary to and independent of the allegations of the offense [to be] proved may normally be treated as a useless averment that may be ignored.'" *United States v. Nickl*, 427 F.3d 1286, 1301 (10th Cir. 2005) (quoting *United States v. Miller*, 471 U.S. 130, 136 (1985)); *see also, e.g.*, *Ford v. United States*, 273 U.S. 593, 602 (1927) ("[A] useless averment is innocuous and may be ignored.").

We have here a situation not unlike that presented in *United States v. Hajecate*, 683 F.2d 894 (5th Cir. 1982), in which the defendants claimed that the allegations of the indictment were inconsistent with the government's allegations in a bill of particulars provided, at defendants' request, to explain the indictment. "Even if the bill was inconsistent with the indictment," the Fifth Circuit explained, "the proper remedy is not dismissal of the indictment but clarification of the bill. The indictment . . . , unless properly amended or superseded, constitutes the full statement of the charges against the defendants." *Id.* at 897; *accord United States v. Arge*, 418 F.2d 721, 724–25 (10th Cir. 1969) ("The indictment must stand on its allegations and whatever the bill of particulars

contained in the way of variance from this allegation . . . does not effect [sic] the sufficiency of the indictment."). The same reasoning applies to each count in an indictment, for each is to be treated as separate. Prefatory factual allegations inconsistent with one count of a thirty-one count indictment, we hold, can warrant dismissal of that count no more easily than factual allegations in a bill of particulars inconsistent with the very count the bill purports to explain.

The case might be different in the unusual situation where an indictment's introductory matter made the instrument as a whole so confusing or misleading that a reasonable defendant would not be "on fair notice of the charges against which he must defend." *Chisum*, 502 F.3d at 1244 (internal quotation marks omitted); *cf. Hajecate*, 683 F.2d at 898 n.2 ("We . . . will not countenance government tactics that confuse defendants by creating inconsistencies between the indictment and the bill."). But here, the defendants were on notice that they needed to defend against the charge of embezzling from a health care benefit program, and it was not necessary for the government to prove the extraneous allegations in the introduction or for defendants to defend against them. If it is true, as defendants contend, that the allegations about HNIC contained in the introduction and in Count 1 are mutually exclusive, the proper course would have been to wait until it was proved that HNIC was an insurance company and then

-12-

argue the insufficiency of the evidence to support Count 1.

### 2. *McCarran-Ferguson Act*

Appellants also challenge the health care fraud charge as precluded by the

McCarran-Ferguson Act, which provides that state law shall generally govern

insurance matters:

> No Act of Congress shall be construed to invalidate, impair, or
> supersede any law enacted by any State for the purpose of regulating
> the business of insurance, or which imposes a fee or tax upon such
> business, unless such Act specifically relates to the business of
> insurance . . . .

15 U.S.C. § 1012(b).  Appellants say that Section 669 impairs "Oklahoma's

administrative efforts to protect insurance policy holders" because their

prosecution "undermine[d]" a lawsuit by the state to recover the money they had

embezzled from HNIC.  Aplts' Br. 43.  In their reply brief, they explain the

nature of the interference:  "Mr. Frost and Mr. Redcorn were completely unable to

defend, or work toward settlement of their case with the [OID] while they were

preparing for trial and defense of the federal criminal prosecution."  Reply Br.

17–18.  Indeed, the case was stayed by mutual agreement during the pendency of

this prosecution, and subsequently settled.

We agree with the government, and with *amicus* the Director of the

Oklahoma Insurance Department, that this type of "interference" does not trigger

McCarran-Ferguson preclusion. Section 669 does not "invalidate, impair, or supersede" any state regulation of insurance; state insurance regulations remain fully in force. Appellants' argument—that being tied up in a federal forum in one kind of proceeding made them unavailable to appear in state court for an insurance-related proceeding—could be made against *any* federal criminal prosecution. They might as easily have been busy defending charges of importing a mongoose, 18 U.S.C. § 42(a)(1), or using the character "Smokey Bear" for profit without authorization, *id.* § 711, or shanghaiing a sailor, *id.* § 2194. All would distract them from defending or working toward settlement of their case with the OID. Yet enforcement of those laws in such a circumstance is surely not precluded by the McCarran-Ferguson Act.

The Supreme Court clarified in *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999), that McCarran-Ferguson does not entirely "cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise." *Id.* at 308. Rather, "[w]hen federal law does not *directly conflict* with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." *Id.* at 310 (emphasis added). So, in *Humana*, the Court upheld against a McCarran-Ferguson challenge

-14-

a private RICO action against an insurer to recover treble damages for corrupt insurance practices, even though state law provided a parallel remedy. The Court observed that "RICO's private right of action and treble damages provision appears to complement Nevada's statutory and common-law claims for relief," and held that "[b]ecause RICO advances the State's interest in combating insurance fraud, and does not frustrate any articulated Nevada policy," the suit was not barred by McCarran-Ferguson. *Id.* at 313–14. Here, even more clearly, § 669 does not "directly conflict" in any way with Oklahoma insurance law; rather, as the Insurance Department urges, it complements state regulation and furthers the state's policy against financial crimes that jeopardize the stability of insurers.

*Munich American Reinsurance Company v. Crawford*, 141 F.3d 585 (5th Cir. 1998), which predated *Humana*, is of no assistance to Appellants. That case concerned application of the Federal Arbitration Act to force certain insurance actions into fora other than the state receivership court, which state law made the exclusive forum. *See id.* at 594–95. This is not at all on point; the statutes conflicted directly and enforcement of the federal law would have thwarted express state policy. That is not the case with Section 669. Indeed, because in the face of a federal criminal prosecution a state retains parallel jurisdiction to prosecute offenses under its own laws, we are skeptical that a federal criminal

-15-

statute would ever be preempted by McCarran-Ferguson unless it were to forbid something affirmatively required by state insurance law.

## B. Counts 2–5: Wire Fraud

Counts 2 through 5 charged Mr. Redcorn and Mr. Frost with wire fraud. A defendant is guilty of wire fraud if, "for the purpose of executing [a] scheme or artifice" to defraud or to obtain money by false pretenses, he "transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds." 18 U.S.C. § 1343. The allegations here were that Appellants diverted incoming HNIC premiums to an Oklahoma HNIC bank account, moved the funds to their personal accounts at the same bank, and then—these are the four charged communications—wired the moneys to their personal investment accounts with a broker in Florida.

"It simply cannot be suggested," Mr. Redcorn and Mr. Frost propose first on appeal, "that transfers of funds by the officers of an insurance company are wire fraud." Aplts' Br. 40. This argument is frivolous. The gravamen of the charge is not that funds are transferred, it is that this is done by wire communication in interstate commerce. Communication by wire for whatever function, by whomever—corporate officers, too—is wire fraud if done "for the

-16-

purpose of executing" a fraudulent scheme.

Appellants further contend that the indictment was insufficient because it did not "allege false statements or deception of any kind," and these are a necessary component of any scheme to defraud. *Id.* at 41. Not so. For purposes of the mail and wire fraud statutes, "[t]he concept of 'fraud' includes the act of embezzlement, which is 'the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another.'" *Carpenter v. United States*, 484 U.S. 19, 27 (1987) (quoting *Grin v. Shine*, 187 U.S. 181, 189 (1902)). False statements are not necessary for perpetrating an embezzlement scheme, so they need not be alleged in an indictment for wire fraud—unless in some unusual case this were necessary to "put[] the defendant on fair notice of the charges against which he must defend, and enable[] the defendant to assert a double jeopardy defense." *Chisum*, 502 F.3d at 1244 (internal quotation marks omitted).

### III. SUFFICIENCY OF THE EVIDENCE

At the close of the government's evidence, and again after the verdicts were handed down, Mr. Redcorn and Mr. Frost moved for a judgment of acquittal on the insufficiency of the evidence to support the charges. On appeal, they renew their arguments as to Counts 2 through 31 of the indictment.[4] Our review

_____

[4] In their brief, the title of the section concerning sufficiency of the
(continued...)

is *de novo*, *United States v. Mendez*, 514 F.3d 1035, 1041 (10th Cir. 2008), and in considering whether the record supported conviction "we must view the evidence in the light most favorable to the government, and reverse only if no rational jury could have found the evidence sufficient to convict beyond a reasonable doubt." *United States v. Nacchio*, 519 F.3d 1140, 1157 (10th Cir. 2008).

## A. Counts 2–5: Wire Fraud

Appellants contend that they should have been acquitted of the wire fraud charges because there was no evidence that the four charged transfers, from their private bank accounts in Oklahoma to their out-of-state investment accounts, were "for the purpose of executing [a] scheme or artifice" to "defraud." 18 U.S.C. § 1343. Once the funds were in their personal accounts, they argue, the scheme (if any) was already complete.[5]

---

[4](...continued)
evidence appears to announce a challenge concerning Count 1, health care fraud, as well. As the government correctly points out, however, the brief turns out to contain no such argument. We will therefore not consider whether the evidence was sufficient to support that count, notwithstanding a terse and conclusory argument on this point raised for the first time in Appellants' reply brief. *See Hanh Ho Tran v. Trustees of State Colls. in Colo.*, 355 F.3d 1263, 1266 (10th Cir. 2004) ("'Issues not raised in the opening brief are deemed abandoned or waived.'" (quoting *Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997))); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002) ("[I]ssues will be deemed waived if they are not adequately briefed.").

[5] Appellants also claim the evidence was insufficient for a jury to conclude

(continued...)

The transmission charged in Count 2, for example, took place when Mr. Redcorn wired $90,000 of money to his investment account with Janney Montgomery Scott (JMS) in Florida, from funds previously embezzled from HNIC and deposited in his Bank of America (BOA) account. Likewise, the transmission charged in Count 5 was a $300,000 wire transfer from Mr. Frost's personal BOA account to his JMS account on April 20. Mr. Frost had previously embezzled these funds from HNIC by drawing three checks from HNIC's BOA account, signed by himself, for a total of $500,000, and depositing them into his personal BOA account. The transfers charged in Counts 3 and 4 were similar; the money was routed from Mr. Redcorn's BOA account first to his account at Arvest Bank, and thence to JMS. In each instance, the appellants' personal BOA, JMS, and Arvest accounts were opened in their true names with their own Social Security numbers.

---

[5](...continued)
beyond a reasonable doubt that there was a scheme of any sort to defraud. "[V]iewing the evidence," as we must, "in the light most favorable to the government," *United States v. Atencio*, 435 F.3d 1222, 1232 (10th Cir. 2006), we disagree. Additionally, in their reply brief Appellants assert that, "[i]n order . . . to have participated in a 'scheme to defraud' as alleged in Counts 2–5, they would have been required to have foreknowledge that the company would ultimately fail. There was no evidence to support this proposition." Reply Br. 12. We can answer this bizarre contention only by saying that defrauding a company—just like defrauding an individual, or the United States—does not require that the victim "fail," let alone that the defendant have "foreknowledge" of it.

-19-

To meet § 1343's "purpose" requirement, a wire transmission must be "part of the execution of the scheme as conceived by the perpetrator at the time." *Schmuck v. United States*, 489 U.S. 705, 715 (1989). The defendant need not have made the transmission personally, merely caused it to be made. It need not be at the heart of a scheme, nor necessary or even helpful for its success; it need not itself be false or deceptive. Rather, as we have said, a transmission is "considered to be for the purpose of furthering a scheme to defraud 'so long as the transmission is incident to the accomplishment of an essential part of a scheme.'" *United States v. Mann*, 884 F.2d 532, 536 (10th Cir. 1989) (quoting *United States v. Puckett*, 692 F.2d 663, 669 (10th Cir. 1982)); *accord Pereira v. United States*, 347 U.S. 1, 8–9 (1954).[6] Nonetheless, at some point the fraudulent scheme must be complete, and the perpetrators' subsequent enjoyment of its fruits—buying groceries, going to the movies, redecorating the bathroom—is not an "essential" part of the scheme. *United States v. Taylor*, 789 F.2d 618, 620 (8th Cir. 1986); *United States v. Altman*, 48 F.3d 96, 103 (2d Cir. 1995). The defendants claim that once they had deposited the embezzled funds in their

---

[6] Interpretations of the federal mail fraud statute, 18 U.S.C. § 1341, are "authoritative in interpreting parallel language in § 1343." *United States v. Lake*, 472 F.3d 1247, 1255 (10th Cir. 2007) (citing *Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005)). In this section we therefore look to the law of the two statutes without differentiation.

personal bank accounts in Oklahoma, the scheme was complete; the subsequent

transfers to Florida, they say, were simply a means of using their ill-gotten gains.[7]

Reluctantly, we are forced to agree. Once the defendants deposited the

funds into their personal bank accounts, they had accomplished their crime and

the funds were available for their personal use. That they chose to transfer part of

their stolen money to their broker in Florida for the purpose of investments is

purely incidental to the fraud; they could just as easily have decided to blow it on

a luxury trip to the Ozarks. Without a closer connection to the mechanism of

their fraud, what they did with the stolen money afterward cannot itself relate to

an "essential part of [the] scheme." *Mann*, 884 F.2d at 536. (quoting *Puckett*, 692

F.2d at 669).

A chorus of Supreme Court opinions applying the parallel language of the

mail fraud statute limns the boundaries of a "scheme to defraud" and explains

when liability for post-fraud communications is apt. *Kann v. United States*, 323

U.S. 88 (1944), was a prosecution of several defendants for cashing checks they

had received in a fraudulent scheme; the defendants were charged with mail fraud

after the paying banks mailed the checks to the drawee banks for recoupment. *Id.*

at 90–92. Although the defendants had caused the use of the mails, the Court

---

[7] We put aside the defendants' insistence that there was no embezzlement and their gains were not ill-gotten, which is irrelevant to the current discussion.

held that the interbank mailings were not in furtherance of their fraudulent

scheme:

> The scheme . . . had reached fruition. The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires.

*Id.* at 94. Later, in *Parr v. United States*, 363 U.S. 370 (1960), the Court quoted

this passage in holding that mail fraud liability would not lie for fraudulent use of

a school district's credit card to purchase gasoline merely because the vendor

mailed invoices to the school district and the district mailed the payment. *Id.* at

393. Similarly, in *United States v. Maze*, 414 U.S. 395 (1974), it held that a

defendant who had used a stolen credit card at a motel could not be convicted of

mail fraud simply because the motel had invoiced the issuing bank by mail:

> [T]he mailings . . . were directed to the end of adjusting accounts between the motel proprietor, the . . . bank, and [the card's rightful holder], all of whom had to a greater or lesser degree been the victims of respondent's scheme. Respondent's scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss.

*Id.* at 402.

In *Schmuck v. United States*, 489 U.S. 705 (1989), the Court at last upheld

a mail fraud conviction. The defendant, a used-car distributor, illegally rolled

-22-

back the odometers on some 150 automobiles before selling them to unknowing dealers at fraudulently inflated prices. The dealers, on later reselling the automobiles to consumers, had to mail title-application forms to the state to transfer title and complete the sale. *Id.* at 707-08. The defendant was convicted of mail fraud for causing twelve such mailings and sought reversal, citing *Kann*, *Parr*, and *Maze* to support his claim that his scheme had reached fruition when the dealers had paid him and the later mailings were not in furtherance of it. *Id.* at 711. But the Court distinguished its prior cases, noting that the mailings in *Schmuck* facilitated the defendant's ongoing scheme because "a failure of th[e] passage of title would have jeopardized Schmuck's relationship of trust and goodwill with the retail dealers upon whose unwitting cooperation his scheme depended." *Id.* at 714.

The government argues that the final, charged transfers to Appellants' JMS accounts "facilitated the scheme to provide Appellants with hundreds of thousands of dollars . . . . The wire transfers of money into their [JMS] accounts merely completed the scheme to defraud HNIC and its policyholders . . . ." Govt's Br. 27. At a post-conviction motion hearing before the district court, the government had put forward one theory of the role the charged transfers played in the scheme: they "got the money out of Oklahoma and helped conceal the

-23-

embezzlement from the auditors. The auditors were aware of the Bank of America account of HNIC and they would much easier be able to find and locate the monies if they hadn't got it out of the state." R., Vol. V, at 11. On appeal, the government offers up a somewhat different theory: having the money in the Florida accounts was the goal of Appellants' scheme, and depositing the embezzled checks briefly in their BOA accounts—which required the subsequent, charged transfers to complete the plot—"would have speeded the immediate availability of the full face value of the checks to Appellants." Govt's Br. 28.

We agree with the government that a transfer is part of a scheme to defraud if it is necessary to put the stolen money in a form useable to the perpetrator. In *United States v. Odiodio*, 244 F.3d 398 (5th Cir. 2001), for instance, the defendant stole and altered a million-dollar check from one corporation to another and deposited it in a bank account he opened in a false name. *Id.* at 400. He then wired the money to a third party's account, and coerced the third party to wire it overseas to the defendant's real account—a transfer that enabled him to use the funds. *See id.* at 403. *United States v. Rude*, 88 F.3d 1538 (9th Cir. 1996), provides a similar example. The defendants in that case used an investment swindle to induce a Hawaii nonprofit called Unity House to wire $10 million to a Swiss bank account, opened in its name, over which the defendants had power of

-24-

attorney. *Id.* at 1542. Then they wired the funds to their own account in the United States, and later wired $650,000 of the principal back to the victim, falsely representing it as return on the investment. *Id.* They were charged and convicted of wire fraud, not for the initial transfer to Switzerland, but for the subsequent transfers, and sought reversal on appeal, claiming that "the wire fraud was completed" once the money was out of the victim's coffers and under the defendants' control in Switzerland. *Id.* at 1544. The Ninth Circuit affirmed. The transfer from Switzerland to the United States, it held, effected a step in the scheme because it "plac[ed] the funds outside of Unity House's account, outside of the scope of Unity House's authorization, and within [defendants'] own control." *Id.* at 1545. It was a final step toward the goal of having the money in a useable form.

*Rude* illustrates a second, important principle as well: transfers, or other wire communications, may constitute wire fraud if they are carried out to conceal an otherwise completed fraud. Thus, although the funds in *Rude* were under the defendants' "control" and beyond the victim's grasp once they had been transferred out of the Swiss account, the later transfer of a portion of the funds back to Unity House, "to create the impression that Unity House was earning an immediate, substantial return on its investment, . . . was not only relevant to the

-25-

fraudulent conspiracy, but extended the overall scheme" by lulling Unity House into a false complacency about the fraud. *Id.* at 1544.

The similar notion of the post-fraud "lulling letter" as relating to an essential part of a scheme to defraud is well accepted. Even after the schemer has extracted what he wants from his victims, a communication will be mail fraud (or wire fraud) if it is intended to "lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely." *Maze*, 414 U.S. at 403; *accord United States v. Trammell*, 133 F.3d 1343, 1352–53 (10th Cir. 1998). It has long been understood that "[a]voidance of detection and prevention of recovery of money lost by the victims are within, and often a material part of, the illegal scheme. Further profit from the scheme to defraud, as such, may be over, and yet the scheme itself be not ended." *United States v. Riedel*, 126 F.2d 81, 83 (7th Cir. 1942)

However, not every wire transfer of ill-gotten money violates § 1343. As the Supreme Court has repeatedly emphasized in the parallel context of § 1341, "'[t]he federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.'"

*Schmuck*, 489 U.S. at 710 (quoting *Kann v. United States*, 323 U.S. 88, 95 (1944)). It is therefore not correct to claim without qualification, as the government did in its closing argument to the jury, that use of the wires is illegal if at all "in relation to" a scheme to defraud, R., Vol. XIV, at 1625. Setting aside cases where the wires are employed so that the fruits of the fraud are useable to the defendant, and cases of lulling or concealment, "as a general proposition, use of the [wires] after a scheme reaches fruition will not constitute grounds for a conviction." *Taylor*, 789 F.2d at 620; *accord Altman*, 48 F.3d at 103.

We can find in the record of this case no evidence that, as "the scheme [was] conceived by the perpetrator[s] at the time," *Schmuck*, 489 U.S. at 715, the charged wire transfers from Appellants' personal BOA accounts to their personal JMS accounts were necessary to gain control over the funds or to conceal the nature of Appellants' fraud on HNIC. Certainly they do not fit the classic mold of the "lulling" communication, carried out to delay complaint or to enable an ongoing scam to continue, as HNIC had no reason to learn of the transfers at all. The government asserted below that these transfers "helped conceal the embezzlement from the auditors," R., Vol. V, at 11, but that claim was not supported then by reference to the transcripts, and is not supported now by our own review of the auditors' testimony. There is no evidence that the transfers

charged in this case helped conceal Appellants' fraud or were meant to do so. If anything, the four charged transfers to separate investment accounts in Florida made it *more*, not less, obvious that Appellants were taking these funds for themselves: the transfers undercut Appellants' defense that they were holding these funds as a war chest to sue Steve Silverstein on HNIC's behalf.[8]

Nor do we find any evidence to support the government's current theory that the transfers to Florida somehow "speeded the immediate availability" of the funds. Govt's Br. 28. The funds were "available" from the moment they were deposited in Appellants' BOA accounts, and could be spent, transferred, or otherwise drawn on at their pleasure. We see nothing to bear out the contention that moving the stolen funds to JMS would have been slower without the intermediate stopovers. On the contrary, in Counts 2, 3, and 4 the BOA stopovers lasted four days or longer—hardly a sign that speed was of the essence.

It might well be that Appellants' use of their Bank of America accounts speeded the availability of the embezzled funds. But they were not prosecuted for transferring the funds to those accounts; they were prosecuted for subsequent transfers to their broker in Florida. We think the "scheme to defraud" ended at

---

[8] The question here is not whether, after the fact, the transfer was useful for purposes of concealment, but with whether that was its purpose. *See Schmuck*, 489 U.S. at 711, 715.

-28-

the earlier step, before the interstate wires were used. It was at that point that "[t]he persons intended to receive the money had received it irrevocably" and the scheme "had reached fruition." *Kann*, 323 U.S. at 94. Although Appellants may have wished to draw an investment return on the proceeds of their fraud, investing stolen money is no more a part of a scheme to defraud than spending it.

If Mr. Redcorn and Mr. Frost had used the interstate wires to transfer money directly from an HNIC account to their own, they would be liable for wire fraud. Instead, they deposited the proceeds of their scheme by check into accounts at the same bank. The government has pointed to no evidence in the record that could show that the subsequent, charged transfers from Appellants' checking accounts to their investment accounts were "incident to the accomplishment of" anything more than drawing a better return on the money. *Mann*, 884 F.2d at 536 (quoting *Puckett*, 692 F.2d at 669). Without evidence that these transfers were "'a step in the plot'" to defraud HNIC, *Schmuck*, 489 U.S. at 711 (quoting *Badders v. United States*, 240 U.S. 391, 394 (1916)) (alteration omitted), we must reverse the convictions on Counts 2 through 5.

## B. Counts 6–31: Money Laundering

The remaining counts of the indictment—Mr. Redcorn was convicted on Counts 6 through 23, and Mr. Frost on Counts 24 through 31—fell under 18

U.S.C. § 1957(a), which punishes anyone who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."[9] "Criminally derived property" is "any property constituting, or derived from, proceeds obtained from a criminal offense." *Id.* § 1957(f)(2). "Specified unlawful activity" includes health care fraud under 18 U.S.C. § 669, *see id.* §§ 24(a)(1), 1956(c)(7)(F), 1957(f)(3), and wire fraud under 18 U.S.C. § 1343, *see id.* §§ 1956(c)(7)(A), 1957(f)(3), 1961(1).

Appellants now argue that, because they should be acquitted of the health care fraud and wire fraud counts, there was no "criminally derived property" and, as a result, these money laundering counts should be dismissed for lack of an adequate predicate. Our review shows that all the transactions charged under § 1957(a) involved the proceeds of the health care fraud charged in Count 1. As we uphold the convictions on that count, the money laundering counts stand as well.

---

[9] Section 1957(a) is erroneously drafted so that it is the *offender* who must be "derived from specified unlawful activity." *Compare* Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, Title I, § 1352(a), 100 Stat. 3207, 3207-21, *and* 18 U.S.C.A. § 1957(a) (West), *with* 18 U.S.C.S. § 1957(a) (LexisNexis) (inserting the phrase "that is" before "of a value greater than $10,000"). However, the requirement is well understood to apply to the criminally derived property instead. *See, e.g.*, *United States v. Lake*, 472 F.3d 1247, 1260 (10th Cir. 2007); *United States v. Lovett*, 964 F.2d 1029, 1042–43 (10th Cir. 1992).

## IV.  NEWLY DISCOVERED EVIDENCE

The jury returned its verdict of conviction on December 16, 2005.  On February 6, 2006, the Oklahoma Insurance Department turned over 534 pages of documents it had not previously produced in response to a defense subpoena.  Citing this newly discovered evidence, Mr. Redcorn and Mr. Frost moved for a new trial under Rule 33(a) of the Federal Rules of Criminal Procedure, which permits a court to vacate a conviction and grant a new trial "if the interest of justice so requires."  In support of their motion, and now their appeal after the district court's denial, Mr. Redcorn and Mr. Frost point to four emails and two letters among the February 6 disclosure which they say could have won them the trial.

"A motion for a new trial based on newly discovered evidence is generally disfavored and should be granted only with great caution."  *United States v. Gwathney*, 465 F.3d 1133, 1143 (10th Cir. 2006) (internal quotation marks omitted).  Where the basis for a motion is evidence merely newly discovered, and there is no claim that evidence was improperly withheld, the defendant must show that

> (1) the evidence was discovered after trial; (2) the failure to learn of
> the evidence was not caused by his own lack of diligence; (3) the
> new evidence is not merely impeaching; (4) the new evidence is
> material to the principal issues involved; and (5) the new evidence is

of such a nature that in a new trial it would probably produce an acquittal.

*Gwathney*, 465 F.3d at 1144 (quoting *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997)).  But when a movant alleges "suppression by the prosecution of evidence favorable to [the] accused upon request," *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the standard is easier to meet.   The defendant need show only that "'(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.'"  *United States v. Mendez*, 514 F.3d 1035, 1046 (10th Cir. 2008) (quoting *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999)).  In the former case, our review of the denial of a motion for a new trial is for an abuse of discretion, *Gwathney*, 465 F.3d at 1144; in the latter, it is *de novo*, *Mendez*, 514 F.3d at 1046.

On appeal, Mr. Redcorn and Mr. Frost "contend the Government did not comply with *Brady* by withholding [the OID disclosures] from the defense." Aplts' Br. 49.  However, they made no such claim below, and at a hearing did not elect to differ with the district court's interpretation of their arguments:  "We do not have here an assertion of a *Brady* . . . violation. . . .  This is a straightforward newly discovered evidence issue, which does not involve any suggestion of

-32-

misconduct by the U.S. [G]overnment in this case." R., Vol. V., at 15. This *Brady* claim was therefore forfeited, and we review it now for plain error only.

In that light we need not decide whether there was error at all, because the error if any was not plain. The material at issue was allegedly withheld by the Oklahoma Insurance Department, not by the United States Attorney's Office or any other federal agency or officer. Although some cases suggest that "[t]he government cannot compartmentalize the Department of Justice" and so "different 'arms' of the government, particularly when . . . closely connected," should be treated together for *Brady* purposes, *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973), *overruled on other grounds by United States v. Henry*, 749 F.2d 203 (5th Cir. 1984), others emphasize that "*Brady* expressly applies to material evidence withheld from the defense *by the prosecution*," *United States v. Sherlin*, 67 F.3d 1208, 1218 (6th Cir. 1995), and that where "documents were never disclosed to the government and not in the government's possession, th[e] case would not appear to fall within the mandatory disclosure rule of *Brady v. Maryland*." *United States v. Wilson*, 798 F.2d 509, 514 (6th Cir. 1986). We find nothing in the cases to show that federal prosecutors may be held responsible for the omissions of a state regulatory agency—an arm of a different government altogether—and nothing in the record of this case to indicate that the U.S.

Attorney's Office and the OID had a working relationship close enough to trigger such a rule if it existed. Plain error must be "clear or obvious under current law," *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007) (internal quotation marks omitted), which this was not. Moreover, for the reasons explained next, we could not find that any error as to these disclosures affected Appellants' "substantial rights" or "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings," as would be required for their claim to succeed. *United States v. Chisum*, 502 F.3d 1237, 1244 (10th Cir. 2007) (internal quotation marks omitted).

To the extent Appellants still pursue the newly-discovered-evidence claim they brought below, we find denial of their motion well within the district court's discretion. The item Appellants told the district court they thought most important was a June 26, 2001, internal email from OID Deputy Director Frank Stone, an actuary who testified at the trial, to John Beers, an OID examiner. In it, Mr. Stone mused, "If Brad Frost owns 50% of Heritage National and is the President, how can he be terminated and how could he be stealing from the company?" R., Vol. II, Doc. 122, Exh. C. If this was meant to express the legal opinion that a corporate officer and shareholder cannot steal from his own company, it was both inadmissible and incorrect. Nor could it have been used, as

Appellants proposed below, to bolster their defense that they took the money in good faith, or to show that the "resignation letters" they produced at trial, dated April 10, 2001, to support their defense that the money they took was a severance or buyout. The email was written two and a half months later and still assumed that Mr. Frost "*is* the president" of the company. The same applies to another email from Mr. Stone to Mr. Beers, dated July 6, 2001, in which Mr. Stone wondered why Brad Frost would go to a meeting to sign an HNIC financial statement: "John, I thought that Brad Frost resigned from the company. Can he sign a financial statement today?" *Id.*, Exh. D. This could hardly establish that Appellants had resigned three months prior; if anything, it showed that they were still involved in corporate affairs in a way inconsistent with their claimed resignation.

We need not tarry long with the rest. Two other items Appellants cite were letters in April and May 2001 from Steve Silverstein, the co-owner of HNIC, to OID which mentioned loans to corporate officers and which Appellants think would have "demonstrated the department had knowledge of the loans to Appellants." Aplts' Br. 50. Even if this were true, the OID's knowledge could not establish that the "loans" were legitimate and not a cover for embezzlement. Last is a May 17, 2001, email from Hallie Burnett, the OID accountant who

investigated HNIC's finances from the inside, to a Mark Jaster at OID. The email discussed offshore bank accounts, blackmail, and other sly dealings of Mr. Redcorn and Mr. Frost. They now say these allegations were false, and that by exposing the falsehoods they could have undermined Ms. Burnett's credibility. Assuming *arguendo* that her claims were false, it would yet be a risky gambit to point the jury to accusations against oneself in hopes of later disproving them and so discrediting the accuser. If the ploy failed, the self-inflicted damage could be severe. Even if successful, though, at best it would have provided "merely impeaching" ammunition, in no way "material to the principal issues involved," to use against Ms. Burnett. *Gwathney*, 465 F.3d at 1144.

"Denial of a new trial 'is an abuse of discretion only if it is arbitrary, capricious, whimsical, or manifestly unreasonable.'" *United States v. Lamy*, 521 F.3d 1257, 1266 (10th Cir. 2008) (quoting *Gwathney*, 465 F.3d at 1144). Given the weaknesses in the proposed evidence, and the reams of documents and volumes of testimony that were presented to the jury in this case, the district court was not unreasonable to conclude that none of these newly discovered items could possibly be considered so significant as to "probably produce an acquittal." *Gwathney*, 465 F.3d at 1144.

## V.  SENTENCING

Finally, Appellants contend that the sentences imposed upon them by the district court were unconstitutional because the court calculated their advisory ranges under the United States Sentencing Guidelines on the basis of facts, such as the amount of HNIC's loss, which were not specifically found by the jury.  We interpret this as an argument that it is unconstitutional for the sentencing judge to rely upon a fact not found by the jury or admitted by the defendant in determining a sentence, where the sentence would not be reasonable in the absence of that fact.  That argument, however logical based on the interpretation of the Sixth Amendment in *Blakely v. Washington*, 542 U.S. 296 (2004); *see Rita v. United States*, 127 S. Ct. 2456, 2476–78 (2007) (Scalia, J., concurring in part and concurring in the judgment), carries no weight under the remedial opinion in *United States v. Booker*, 543 U.S. 220 (2005).  As the Court explained in *Booker*, "when a trial judge exercises his discretion to select a specific sentence within a defined [statutory] range, the defendant has no right to a jury determination of the facts that the judge deems relevant." *Id.* at 233.  For a violation of 18 U.S.C. § 669, health care fraud, the statutory maximum term of imprisonment is ten years, *id.* § 669(a).  For wire fraud, the maximum is twenty years, *id.* § 1343; and for money laundering, ten years, *id.* § 1957(b).  These defendants received concurrent

sentences of 72 months apiece on each count of conviction. The district court was within its constitutional authority in finding the facts that led to discretionary sentences within those statutory ranges.

## VI. CONCLUSION

For these reasons, we **REVERSE** the judgments of conviction as to Mr. Redcorn and Mr. Frost on Counts 2 through 5 of the indictment, and **AFFIRM** on all other counts. Because the district court ordered each defendant to serve a post-imprisonment term of supervised release of three years on every count except 2 through 5, but of five years on the reversed counts, we **REMAND** to the United States District Court for the Northern District of Oklahoma for resentencing.